Angel DAVID GONZALEZ, Plaintiff,

v.

Astol CALERO, Individually and as Superintendent of Police, Defendant.

Civ. No. 74–1216.

United States District Court,
D. Puerto Rico.

April 14, 1977.

Laffitte & Dominguez, Hato Rey, P. R., for plaintiff.

Miguel A. Pagán & Hector González López, Dept. of Justice, San Juan, P. R., for defendant.

## OPINION AND ORDER

PESQUERA, District Judge.

In the present action, plaintiff seeks money damages and injunctive relief under 42 U.S.C. 1983 and its jurisdictional counterpart 28 U.S.C. 1343. It is alleged that defendant summarily discharged him from his employment as Captain of the Police of Puerto Rico without prior notice or hearing, thus depriving him of property and liberty rights without the Due Process of Law and in violation of his First Amendment rights.

We issued an order to show cause against defendant and the matters of preliminary and permanent injunction were subsequently consolidated, and the case heard in its entirety, except for the question of damages.

After having considered all the evidence presented, and having reviewed the transcript of this case, together with the exten-

sive documentary evidence, this Court makes the following

## Findings of Fact

1. Plaintiff is a citizen of the United States and a resident of this judicial district.

2. Plaintiff has been engaged in the public service of the Commonwealth and Federal governments since 1952. From 1969 until July 17, 1974 plaintiff served in the Police Department of the Commonwealth of Puerto Rico as an officer, first as a lieutenant and then as captain, in his capacity as Assistant Commanding Officer of the Drugs and Narcotics Division and as Commanding Officer of the Vice Control Division.

3. At all material times herein defendant Astol Calero was the Superintendent of the Police of the Commonwealth of Puerto Rico.

4. In or about March 1973 plaintiff was appointed by defendant as Commanding Officer of the Criminal Investigation Division for the Western Area of Puerto Rico. Immediately thereafter, plaintiff, with the assistance of Wilson Forestier, Director of the Criminal Investigation Division in Mayaguez, organized a Criminal Intelligence Unit and proceeded to investigate organized crime in the aforementioned area.

5. During the course of his research, plaintiff investigated judges, assistant district attorneys, and high ranking police officers of the Commonwealth of Puerto Rico. He examined the possibility of a racket in the issuance of good conduct certificates in the Police Department and in the obtention of gun permits. For the purpose of these investigations, at plaintiff's request the budget of the Criminal Investigation Division in the Western Area was increased by the defendant.

6. On July 26, 1973, plaintiff participated in a meeting held at the F.B.I. offices at Ramey Air Force Base in Aguadilla. F.B.I. agents and the then United States Assistant District Attorney Juan Pérez-Giménez attended this meeting at which the problem of organized crime in the western area of Puerto Rico was discussed. At said meeting the Federal authorities showed interest in investigating the possible participation of Commonwealth public officials in organized crime.

7. As a result of the aforementioned meeting, plaintiff was invited to travel to Washington, D. C. for an interview with officials of the Criminal Division of the United States Department of Justice.

8. In August 1973 plaintiff had a meeting with his superior, defendant Astol Calero, and with the then Secretary of Justice of the Commonwealth of Puerto Rico, Francisco De Jesús Schuck, Special District Attorney Ramón Cestero, Assistant Secretary of Justice Agrait, and an attorney from the Police Department.

9. At this meeting plaintiff's investigations and interviews with Assistant United States District Attorney Pérez-Giménez were discussed and he requested permission to travel to Washington, D.C. He further requested that a Special District Attorney be assigned to collaborate with him in the investigation of organized crime in the western area of Puerto Rico. Both the assignment of a district attorney and his request to travel to Washington were denied by the then Secretary of Justice De Jesús Schuck.

10. By and around the end of April 1974 plaintiff conducted a raid whereby a justice of the peace was arrested and charged with violation of the gambling laws of Puerto Rico.

11. Subsequent to said raid, on May 9, 1974, defendant Astol Calero summarily transferred plaintiff from the Criminal Investigation Division for the Western Area to the Traffic Division of the same. On that date plaintiff was again transferred as Commanding Officer for the District of Mayaguez and then later that day to the Municipality of Utuado as Commanding Officer.

12. From May to July 1974 defendant received some complaints about plaintiff's

conduct. After an investigation, plaintiff was totally exonerated except for a reprimand due to a minor fault.

13. On May 20, 1974, and pursuant to various requests from Néstor F. Concepción, journalist for the newspaper EL DIA, plaintiff had an interview with said newspaperman in which he provided some information related to his activities as Commander for the western area.

14. On May 21, 1974 an article appeared in the aforementioned newspaper signed by reporter Concepción in which a series of imputations and accusations against some government officials were attributed to plaintiff by Mr. Concepción.

15. Subsequent to said article and as a result of the extensive coverage given by the press to such alleged manifestations, plaintiff both publicly and privately denied the same, adding that the imputations allegedly made by him may have come about as interpretations made by the reporter of some information he provided.

16. On May 28, 1974 plaintiff made a sworn statement before Special General District Attorney Alcides Oquendo Maldonado, Chief of the Division for Investigations and Criminal Matters of the Commonwealth Department of Justice, in which he elucidated his imputed declarations to Mr. Concepción.

17. As a result of the aforementioned "declarations" an investigation was ordered by defendant, appointing Captain Lucas Aponte Cruz to effectuate the same. During said investigation Captain Aponte Cruz obtained a sworn statement from reporter Concepción in which he reiterated the information given in his article. Captain Aponte Cruz also obtained a sworn statement from plaintiff in which he testified as follows:

". . . I testify that on May 28, 1974, before the Chief of the Division for Investigation of Criminal Matters for the Department of Justice, Mr. Alcides Oquendo, I made an ample testimony of more than six pages . . . That I

made under oath a detailed exposition of the same facts you are investigating for which reason I would like to have before me a copy of said testimony with the purpose of referring to it in case you may wish to discuss some of the concepts stated therein. I wish to state emphatically and specifically that I am at the best disposition that at any time you may deem convenient attest to the same facts, when and if I have before me a copy of said testimony sworn before prosecutor Oquendo to which I subscribe and ratify in each and all of its parts."

18. At said investigation plaintiff further testified that he was at the best disposition of broadening his previous testimony in case it were needed and requested Captain Aponte Cruz to furnish him with a copy of the affidavit submitted to prosecutor Oquendo.[1]

19. In his report on the administrative investigation made by Captain Aponte Cruz to his superior, Lt. Col. Andrés Lugo Cay it was concluded that plaintiff had violated some rules of the Police Regulations and his expulsion from the force was recommended.

20. By a letter dated July 16, 1974 plaintiff was terminated in his employment for violation of the following rules of the Police Regulations.

*Rule 2*—To ridicule, criticize or censor, be it written or orally, in public or in private, the acts, directives, determinations or legal orders of the Superintendent, of an officer, a member with command authorization or any civil officer of the Police, with sufficient authority to give orders, be that authority granted by the legislature, or by determination of the Superintendent, said orders given as a result or in relation to the official duties of those officers.

*Rule 3*—To contest without any based motives the honesty, integrity and competence of any member of the force or civil officer, or make improper manifestations

---

1. A copy of the sworn statement made by plaintiff before prosecutor Oquendo was never afforded to him.

with the only purpose of denigrating his dignity.

*Rule 8*—To show manifest incapacity, inattitude disregard or negligence while exercising the duties, functions and responsibilities of a member of the Police and enumerated in Chapter VI of this regulation. To these effects the members of the Police will retain their condition as such at all times and wheresoever they may be in their free time within the territorial jurisdiction of the Commonwealth of Puerto Rico.

*Rule 26*—To observe an injurious, immoral or disorderly conduct thus harming the Police Department.[2]

21. Both defendant Calero and Captain Lucas Aponte Cruz characterized plaintiff as a good, honest, hard working Police officer.

22. At no time during the aforementioned investigations were any efforts made to obtain the sworn statement mentioned by plaintiff nor were additional sources examined to ascertain whether the information that appeared in the newspaper had been in fact offered by plaintiff.

23. At no time was plaintiff afforded a pretermination hearing in which he could prove that he had not made the imputed declarations. He was not asked to respond in writing to the charges made against him, and was not even given the opportunity to respond orally to the defendant who was the one charged with the responsibility of making the termination decision.

24. Plaintiff took an appeal of his discharge to the Investigation Appeal and Prosecution Commission pursuant to 1 LPRA 172(2). However, the Appeal Commission took no action on plaintiff's case from July 18, 1974 until the filing of the present complaint on November 4, 1974 at which time plaintiff moved for voluntary dismissal after he was denied the opportunity to make discovery efforts.

2. Said letter further stated:

"The facts giving bases to this termination are the following:

That on May 20, 1974 you got in touch with Mr. Néstor F. Concepción Cruz reporter of the island daily newspaper EL NUEVO DIA, informing him that you have some information to offer him, in which as you said and we quote, 'the baby was going to fall from the craddle'. Your meeting with the aforementioned reporter was held that same day, May 20, 1974 at 7:00 p. m. at the home of your mother . . .

The information which you provided to reporter Néstor F. Concepción was published in the newspaper EL NUEVO DIA on May 21, 1974. You informed Mr. Concepción Cruz that confidential information obtained through investigations carried out by you in your official duty showed irregularities in the exercise of duties by prosecutor Euripides Cordero from the Superior Court, Aguadilla Part and Hon. Judge José Villares Rodríguez, administrative judge of the Superior Court, Caguas Part.

You informed said reporter that the officers and employees of the Police of Puerto Rico to which you informed the outcome of said investigations, did not take any action in relation to them.

You continued informing reporter Concepción Cruz (information published on May 21, 1974) that prosecutor Euripides Cordero made endeavors with the Assistant Superintendent of Police in charge of the Field Operations Division, Col. Jorge Camacho Torres, to order your transfer from Director of the Criminal Investigation Division in the West Area to the Police District of Utuado due to the influence that prosecutor Euripides Cordero had with Col. Camacho, since they were very close friends. This transfer had the purpose, as you informed reporter Concepción Cruz, of interrupting the investigations that you were carrying out, being these imputations absolutely false.

If a special investigation had been ordered to you or if, on the other hand, you had decided to initiate it or to start it on your own initiative, as officer in charge of the Division of Investigations for the Western Area, your duty was to render the corresponding reports to your superiors and take all the necessary measures to protect the evidence that had been obtained in order to submit the same before a magistrate at the pertinent time after the corresponding authorities had made the final determination about the pertinent action to take. Nevertheless, while you declared to reporter Concepción Cruz that the aforementioned investigations were submitted by you to your superiors for their examination, evaluation and final determinations, you further had them published, adversely affecting the effectiveness that those investigations might have had."

Upon due consideration of the preceding Findings of Fact, and after thoroughly pondering the points brought out in the post-trial memoranda submitted by the parties, this Court makes the following

## Conclusions of Law

 This Court has jurisdiction under 42 U.S.C. 1983 and 28 U.S.C. 1343.[3]

Plaintiff's first cause of action is based on the contention that his freedom of expression was abridged by defendant in dismissing him from his position for his alleged declarations to the press. We have serious doubts about the merits of such an argument (see *Hanneman v. Breier*, 7 Cir., 528 F.2d 750 (1976); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). However, we need not pass on that as we find that plaintiff's claim of having been deprived of property and liberty without due process of law is dispositive in the instant case.

It has been asserted herein that the dismissal without prior hearing effectuated by defendant constituted a deprivation of both property and liberty rights of the plaintiff without the due process of law. Such purported violations of procedural and substantive due process call for a detailed examination of various aspects of this action.

The Supreme Court has advanced the pertinent framework for the resolution of a due process claim such as that presented here. The initial determination is whether the plaintiff has been deprived of "interests encompassed by the Fourteenth Amendment's protection of liberty and property". *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Stolberg v. Caldwell*, D.C., 423 F.Supp. 1295 (1976). If such a deprivation has occurred, the remaining question is "the nature of the process that is due". *Morrissey v. Brewer*, 408 U.S. 471, 484, 92 S.Ct. 2593, 2602, 33 L.Ed.2d 484 (1972); *Stolberg v. Caldwell*, supra; *Mathews v. Elridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 560–72, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The determination of whether a property or liberty right has been abridged is not a simple one. The Supreme Court has not provided us with a clear-cut objective test which may be applied to all types of factual situations. It has observed that the Constitution itself did not create property interests but only extended protection to interests that already exist and whose "dimensions are defined by existing rules or understandings that stem from an independent source such as state law". *Board of Re-*

---

**3.** Defendant asserts that plaintiff must exhaust his administrative remedies prior to coming before this Court. We disagree. Generally suits under the Civil Rights Act are excepted from the rule that a litigant must exhaust available and adequate state administrative remedies before seeking relief in federal courts, because the remedy afforded by the Act "is supplementary to the state remedy". *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961). Furthermore, judicial review is not to be denied for failure to exhaust administrative remedies unless, on balance, the interest served by requiring exhaustion outweighs the injury to the claimant if exhaustion is required. *McKart v. United States*, 395 U.S. 185, 197, 89 S.Ct. 1657, 23 L.Ed.2d 194; *Wagle v. Murray*, 9 Cir., 546 F.2d 1329 (1976). This is not a case in which the individual charged is deprived of nothing until the completion of the administrative proceeding. More so, the damage to plaintiff would be substantial if his remedy under the Civil Rights Act were denied, since the Commonwealth would be denying him any remedy, administrative and judicial, and he would have no recourse for the termination of his employment and his alleged financial loss. (Plaintiff's withdrawal of his appeal to the Investigation Appeal and Prosecution Commission (CIPA) did not interrupt an ongoing administrative proceeding, if not an inadequate administrative remedy) (see *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). Other cases holding that it is not necessary to exhaust state administrative remedies before filing a section 1983 action include *McNeese v. Board of Education*, 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Damico v. California*, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); *King v. Smith*, 392 U.S. 309, 312, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Houghton v. Shafer*, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); *Wilwording v. Swenson*, 404 U.S. 249, 251, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); *Steffel v. Thompson*, 415 U.S. 452, 472, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Ellis v. Dyson*, 421 U.S. 426, 432, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975).

*gents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2708.

■ While there is no constitutional right to public employment as such,[4] a property interest protectable under the Fourteenth Amendment can be created by a specific statutory or contractual entitlement, by implied contract or by the "common law of a particular industry or a particular plant". *Perry v. Sindermann,* 408 U.S. 593 at 601–602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972) quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 579, 80 S.Ct. 1347, 4 L.Ed.2d 1409.

The Supreme Court has recognized that "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights". *Garrity v. New Jersey,* 385 U.S. 493 at 500, 87 S.Ct. 616 at 620, 17 L.Ed.2d 562 (1967); *Hanneman v. Breier, supra.*

■ We must examine at this juncture the provisions of state law that are applicable to plaintiff as a member of the Police Force, and thus determine whether any property rights entitled to procedural protection have been granted by such law.

Law No. 77 enacted on June 22, 1956, 25 LPRA 221b, created a civil public order organization in the Commonwealth of Puerto Rico under the name of "Police of Puerto Rico". This statute, in addition to establishing the organization of the aforementioned body, created the office of a superintendent and empowered him to determine by regulation the organization, management, duties, responsibilities and behavior of the members of the Police of Puerto Rico. See 25 LPRA 221b, c and d. In Sections 221d–101 and 221d–102 the aforecited statute provides what are to be considered slight and serious shortcomings in the conduct of the members of the force and in Sections 221d–111 and 221d–112 the procedure for handling charges and resolu-

tions pertaining to such shortcomings is supplied. Section 221d–111 states:

"(a) Any member of the Police, who in the opinion of the Superintendent commits a serious shortcoming, may be permanently discharged, demoted or suspended from the Force without pay for a period not to exceed 6 months.

All resolutions of the Superintendent permanently discharging, demoting or suspending from employment and pay any member of the Force for a period not longer than 6 months, must be in writing and notice given to the member or members so affected by said resolution in the manner hereinafter provided. The resolution shall state the grounds on which the Superintendent bases his action. . . ."

The regulations further provide for a detailed procedure to be followed in the handling and service of charges and resolutions related to both types of shortcomings.

On May 22, 1972, Law No. 32 was enacted (1 LPRA 171) which created what is known today as the Investigation, Prosecution and Appeal Commission (hereinafter referred to as CIPA). The CIPA operates as an appellate entity at the administrative level, and has jurisdiction to review discharges effectuated by the Superintendent.[5] It is thus apparent that plaintiff's position as a public employee in the Police Force is regulated and protected under the aforecited sections. Moreover, plaintiff had the rank of Captain in the Police Force, having served in various capacities for more than four years.

We thus hold that plaintiff's expectancy in the continuation in his position in the Police Force with the pertinent rank and pay applicable thereto, coupled with the protections offered by the above mentioned state law constitutes a property interest protectable under the Constitution of the United States. *Board of Regents v. Roth, supra; Perry v. Sindermann, supra; Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d

---

4. *Board of Regents v. Roth, supra,* at 578, 92 S.Ct. 2701.

5. In no case is a prior evidentiary hearing required by the above mentioned law.

725; *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556; *Pedroza v. Celeste Benítez*, Civ. No. 594–73 (DCPR), decided on March 21, 1975; *Marín v. University of Puerto Rico*, D.C., 346 F.Supp. 470; See generally *"Specifying the Procedures Required by Due Process: Toward Limits in the Use of Interest Balancing"*, 88 Harv. L.Rev. 1510; *The Due Process Rights of Public Employees*, 50 NYU Law Rev. 310.

■ While deprivation of property interests by itself is sufficient to trigger · the protection of the Fourteenth Amendment, we must further note that as a matter of substantive due process, plaintiff's liberty interests have likewise been affected.

Justice Stewart advanced in *Roth, supra*, a weighty postulate:

"In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." [6]

Although in neither *Roth* nor *Perry* did the Court determine the outcome or the basis of such broadly defined liberty, it did expound on some empirical aspects of the same. A person's liberty interests would be adversely affected by two types of terminations. First, entitlement to a hearing would accrue when, in the making of the decision denying employment, charges were issued that "might seriously damage [the dismissed employee's] standing and associations in his community".[7] Second, a due process claim would become cognizable if "the state, in declining to re-employ the respondent, imposed on him a stigma or other liability that foreclosed his freedom to take advantage of other employment opportunities".[8] When, as in the present case, the reasons for dismissal are explicit, it is upon this Court to decide whether or not social opprobrium would result based upon an evaluation of the probable prejudice generated.[9]

In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) the Supreme Court held that reputation alone did not have automatic constitutional protection, but that the damage to reputation would have to be accompanied by another deprivation to invoke procedural safeguards. In a more recent decision the Court found that a protected liberty interest had not been impaired and no damage to petitioner's reputation had occurred when the reasons for his discharge had not been disclosed to the general public.[10] These two cases have been further expounded in *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92, wherein a policeman was dismissed from his job without a hearing and allegedly stigmatizing material was placed by the City Police Department in his personnel file. The Court held that where the assertedly stigmatizing material had not been contradicted or denied by the employee, he had made no claim under the Fourteenth Amendment.

The present case presents no such characteristics. Plaintiff herein was dismissed for, *inter alia*, "manifest incapacity, inattitude, disregard and negligence" and "injurious, inmoral or disorderly conduct".[11] These imputations, together with the alleged facts from which they presumably originated, have been at all times denied by plaintiff. Moreover, the reasons for plaintiff's dismissal became notorious due to particularly extended coverage by the local press, and public manifestations made by defendant. Consequently, the stigmatizing effect of plaintiff's dismissal cannot be more pellucid. Accordingly, we conclude that plaintiff has been deprived of a liberty interest which merited procedural security.[12] *Pickering v. Board of Education*, 391

---

6. *Roth, supra*, 408 U.S. at 572, 92 S.Ct. at 2707.

7. Id. at 573, 92 S.Ct. at 2707

8. Id.

9. See Id.; Cf. also *The Supreme Court 1975 Term*, 90 Harv.L.Rev. 86–104.

10. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

11. See our Finding of Fact No. 20.

12. Upon review of the particular events in this case, we have also been convinced that plaintiff was deprived of rights comprising "reputation-plus" under *Paul v. Davis, supra*.

U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951); *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515; *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216; *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252. See *Cafeteria Workers v. McElroy*, 367 U.S. 886, 898, 81 S.Ct. 1743, 6 L.Ed.2d 1230; *Roth, supra*, 408 U.S. at 573, 92 S.Ct. 2701.

■ Having determined that defendant, acting under color of state law [13] deprived plaintiff of both property and liberty interests, we must still ascertain what process is due in the instant case.

It has been stated that the essence of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner". *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The Supreme Court has recognized, however, that an opportunity to be heard after the challenged governmental action is often constitutionally adequate. *Mathews v. Elridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). In *Arnett, supra*, it was held, although with diverse supporting arguments,[14] that a post-termination hearing was constitutionally sufficient in the dismissal of a public employee from his position. The Court further noted that legislatively prescribed procedures are not determinative of the protection that will govern a particular property interest. A balancing test is necessary in order to ascertain the process that is due. The Court further decided, with two conflicting rationales, that the existence of *considerable pretermination procedural protection* and the availability of a full eviden-

tiary hearing on appeal satisfied the due process requirement. See 416 U.S. at 170, 94 S.Ct. 1633 (Powell, J., concurring). In that case the affected employee was provided with thirty days advance written notice of the reasons for his proposed discharge and the materials on which the notice was based. *He was accorded the right to respond to the charges both orally and in writing, including the submission of affidavits. Upon request, he was entitled to an opportunity to appear personally before the official having the authority to make or recommend the final decision.* Although a prior evidentiary hearing was not held, the employee could make any representations he believed relevant to his case, and receive a full evidentiary hearing after removal. Justice Powell thus noted:

> "These procedures minimize the risk of error in the initial removal decision and provide for compensation for the affected employee should that decision eventually prove wrongful." [15]

We have been unable to find reasonable pretermination procedural safeguards in the present case. To the contrary we have found a flagrant violation of the very limited pretermination procedural safeguard of an investigation, not statutorily mandated but rather established by custom.

Although plaintiff was interrogated during the investigation conducted prior to his dismissal, no reasonable attempt to discover the facts was made by the investigator. Plaintiff had previously declared under oath before a special prosecutor, supposedly elucidating the facts of this case. Plaintiff made it clear that he was very willing [16] to testify and to answer any questions that the investigator posed, but that he would need a copy of his previous sworn statement to freshen his recollection and to refer to it so that he could broaden his testimony. He

---

**13.** Defendant does not contradict that he acted in his capacity as Police Superintendent under 25 R&RPR 221d-111.

**14.** Five Justices wrote opinions: Mr. Justice Rehnquist, for the plurality; Mr. Justice Pow-

ell, in concurrence; and Justices White, Douglas and Marshall, each in dissent.

**15.** *Arnett, supra*, at 170, 94 S.Ct. at 1652.

**16.** See our Finding of Fact No. 17.

further stated that he subscribed to and ratified each and every part of the previous sworn statement, and would expound on it if requested.[17] The investigator made no efforts whatsoever to procure the sworn statement and instead recommended plaintiff's expulsion from the Police Force.

Apart from the aforementioned, plaintiff was not afforded opportunities by which he could rebut the imputed acts. Consequently, we believe that the rationale of *Arnett, supra,* does not apply to the factual situation present herein. We will thus have to further analyze the procedural due process requirements of this case.

The doctrine expressed in *Roth, Perry* and *Arnett, supra,* reached its most detailed exposition in *Mathews v. Elridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), wherein the Supreme Court articulated three factors for identifying the specific dictates of due process:

"first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (424 U.S. at 335, 96 S.Ct. at 903)

In the instant case, the first factor consists of plaintiff's expectancy in the continuation of his employment with the salary, rank, pension rights and all other benefits appertaining thereto; additionally, plaintiff's liberty interests in not being "stigmatized" must be accorded great weight, particularly when the events that led to the present action reached accelerated notoriety through intense coverage by the press. Consequently, the private interests involved herein are substantial.

*Elridge* further requires us to consider the value to be gained from additional procedures. The emphasis is on the minimization of erroneous deprivation of interests. *Stolberg v. Caldwell, supra,* at 1301.

We must note at this juncture that by the time of the termination of plaintiff's employment a very confusing situation had originated. Plaintiff had emphatically denied that he had made the declarations that came out in the press. A dismissal at such time would necessarily amount to a finding that plaintiff had so declared, and thus been negligent in the performance of his duties as a captain in the Police Force. Thus, additional pretermination procedural safeguards could only unmesh the prevailing quandary and prevent an erroneous deprivation of plaintiff's property and liberty rights.

Finally, an analysis of the third *Elridge* factor shows that the government's interests could have been protected without excessive burdens at the administrative level. Under 25 R&RPR 221d–111, defendant could suspend plaintiff from his job without pay if he thought plaintiff had committed a serious shortcoming. Pursuant to said section, plaintiff would be informed in writing of the charges pressed and could presumably rebut them before more drastic means, such as discharge, would be adopted by defendant. In this way the government would be protected by suspending the alleged violator from his position while at the same time affording him procedural protection before dismissing him from his job. The suspension procedures, coupled [18] with a reasonable investigation of the facts, would clearly comport with the require-

17. Id.

18. We notice that Rule 9 of 25 R&RPR 221d–102, which appears to be applicable to the facts of this case, was not cited by defendant in his letter of dismissal. Violation of said Rule constitutes a "slight shortcoming", and suspension may be imposed to violators. Said Rule states:

"To furnish any kind of information for the purpose of making himself notorious through the press, radio, or any means of public information in connection with matters related to his official position."

ments of federal due process. See *Arnett, supra,* at 170, 94 S.Ct. 1633.

We finally reach the point where we must determine the exigencies of federal due process in the present case. We start by reiterating the need for reasonable pretermination procedural safeguards if a post-termination evidentiary hearing is to be constitutionally sufficient herein. *Arnett v. Kennedy, supra.* It has been conceded that the pressing of charges to police officers is always preceded by an investigation of the facts. In the instant case the procedural safeguards required by *Arnett* would have been complied with by pursuing a reasonable and fair investigation or alternatively, suspending plaintiff from his job while the risk of an erroneous dismissal was reduced. The unique nature of the events that led to this action so required. Nevertheless, the investigation conducted on plaintiff herein amounted to a bureaucratic facade, predetermined to discharge plaintiff from his position. Such vexatious snaring of property and liberty rights cannot withstand the mandates of the Fourteenth Amendment. Thus, while the pertinent regulations are constitutional,[19] they have been unconstitutionally applied herein.

In view of the foregoing, we hereby find that, having plaintiff been terminated from his employment without an effective opportunity to be heard at a meaningful time and in a meaningful manner, his constitutional right not to be deprived of property and liberty without the due process of law was violated. See *Stretten v. Wadsworth Veterans Hospital,* 9 Cir., 537 F.2d 361, 369 (1976); *Johnson v. Mathews,* 8 Cir., 539 F.2d 1111 (1976); *Behan v. City of Dover,* D.C., 419 F.Supp. 562 (1976); *Thurston v. Dekle,* 5 Cir., 531 F.2d 1264 (1976).

Consequently it is hereby ORDERED that plaintiff be reinstated to his former position as Captain in the Police of the Commonwealth of Puerto Rico with all the rights and privileges appertaining thereto and it is further

ORDERED that defendant Astol Calero, his successors in office and their agents, servants, employees and attorneys and all persons in active concert or participation with them be permanently enjoined and restrained from terminating plaintiff's employment or from decreasing his salary in the manner described hereinbefore.

We further find that defendant, by not pursuing a reasonable and fair investigation and thus not affording plaintiff an opportunity to be heard at a meaningful time cannot now avail himself of the defense of good faith[20] and thus a hearing is hereby set for April 27, 1977 at 9:00 a. m. wherein the question of damages will be determined.

---

**19.** Defendant contends that our holding that the right to a hearing on appeal was insufficient would necessarily entail declaring part of the Police Regulations unconstitutional and thus the convening of a three-judge court would be mandatory. We have no quarrels with the constitutionality of such regulations, (see *Hernández Jiménez v. Astol Calero,* Civ. 75–311, Opinion rendered on August 13, 1975) although we find them unconstitutionally administered. Accordingly, the convening of a three-judge court is not required by law. *Lombardi v. Regan,* D.C., 341 F.Supp. 718 (1972).

**20.** The immunity accorded to high executive officers has been qualified; it can be negated by actions violating a person's "unquestioned constitutional rights" or by acts taken with impermissible intentions. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). See also Antieau, *Federal Civil Rights Acts,* Lawyers Coop. (1971) Section 89.