Donald **VENTETUOLO** and Alfred Santaniello, Plaintiffs,

v.

Dr. Fred **BURKE**, Commissioner of Education, State of Rhode Island and Dr. Rudolfo Martinez, Individually and as Director of Northeast Area Manpower Institute for Development of Staff, Defendants.

Civ. A. No. 5046.

United States District Court, D. Rhode Island.

May 31, 1978.

Ralph J. Gonnella, Providence, R. I., for plaintiffs.

J. Peter Doherty, Asst. Atty. Gen., R. I., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

Plaintiffs Donald Ventetuolo and Alfred Santaniello bring this damage action under 42 U.S.C. sec. 1983 (1970), claiming that defendants, Dr. Fred Burke, then Commissioner of Education for the State of Rhode Island, and Dr. Rudolfo Martinez, then Director of Northeast Area Manpower Institute for Development of Staff ("NEAMIDS"), violated their rights secured by the fourteenth amendment by depriving them of their "liberty" interest in reputation and "property" interest in continued employ-

ment with NEAMIDS without procedural or substantive due process. In addition, plaintiffs pend a state law claim for defamation. As per agreement of the parties, the Court today decides the question of liability; a jury trial was reserved for the determination of damages.

Prior to 1971, both plaintiffs were employed by the Rhode Island Department of Education in the Manpower Development Training Program where Mr. Ventetuolo served as the State Coordinator. In May or June of 1971, both men left their jobs with the state manpower program to join a new office, NEAMIDS, funded by the United States Office of Education. NEAMIDS' purpose was to coordinate manpower programs and train staffs throughout the northeast, in conjunction with other regional offices nationwide. The federal funds were channelled through the Rhode Island Department of Education. At its inception in 1971, the office was located at and administered by the University of Rhode Island. In 1972, NEAMIDS relocated in Cranston and ended its affiliation with the University. From that time forth, NEAMIDS was under the direction of the Rhode Island Department of Education.

Both Messrs. Ventetuolo and Santaniello were recruited in May or June of 1971 by Dr. Martinez, the recently appointed Director of NEAMIDS. Mr. Ventetuolo signed a contract as Assistant Director of NEAMIDS with the University of Rhode Island; the contract was to expire December 31, 1971. Following the expiration of the contract, Mr. Ventetuolo continued his employment at NEAMIDS without a contract; he received only a document signifying his appointment. At all times, Mr. Santaniello was employed at NEAMIDS without any written contract or documentation.

By late fall of 1971, what had been a happy ship at NEAMIDS was beset by internal factionalism. Many of the staff's complaints, centering primarily on their overburdened schedules, were brought to Mr. Ventetuolo. Dr. Martinez and Mr. Ventetuolo discussed these internal difficulties with various officials on the national and regional level outside the Rhode Island base. Ultimately in early July of 1972, Mr. Ventetuolo wrote to Commissioner Burke to request a meeting with the Commissioner and Dr. Martinez to definitely establish Mr. Ventetuolo's role, responsibilities and authority. No meeting, however, was ever held.

On August 22, 1972, while the plaintiffs and Dr. Martinez were attending a national conference of AMIDS, Dr. Martinez served plaintiffs with letters of termination, effective immediately. In the letter, Dr. Martinez charged Mr. Ventetuolo with "blatant insubordination" at private and staff meetings, consisting of expressions of "open hostility", "complete refusal to accept the commands of the director" and defiance of "the directives of the national concept". Mr. Santaniello was charged with "open alliance to the assistant director" and "overtly expressed hostility" that "tended to alienate the staff and reduce staff morale". Dr. Martinez refused to grant a request for a hearing. Upon receipt of the termination letter, Mr. Ventetuolo immediately contacted Commissioner Burke's staff.

On September 6, 1972, both plaintiffs received notices from Dr. Martinez that the termination decision was rescinded and, in its stead, both would be indefinitely suspended with pay. Commissioner Burke refused plaintiffs' request for a hearing because they were only suspended rather than terminated.

On November 27, 1972, Dr. Martinez filed with Commissioner Burke 18 charges against Mr. Ventetuolo, ranging from alleged violations of office policy, lack of professional courtesy, incompetence, encouraging divisiveness and calling the Director a "mouse". The eight charges against Mr. Santaniello included violations of office policy, abuse of telephone privileges and incompetence. Hearings were held by the Associate Commissioner in December, 1972 and January, 1973. On February 7, 1973, the Associate Commissioner found that none of the charges were substantiated, excepting the allegation that Mr. Ventetuolo called Dr. Martinez a "mouse". The

Associate Commissioner concluded that, although that charge was factually supported, the circumstances, involving some provocation, the fact that the words were spoken in the privacy of Dr. Martinez's office, and Mr. Ventetuolo's subsequent apology, made Mr. Ventetuolo's recommended termination without "just cause". The Commissioner, by letter dated February 8, 1973, reinstated both plaintiffs. Dr. Martinez was relieved of his duties upon their reinstatement.

Subsequently, in mid-March of 1973, the project relocated out of Rhode Island and was placed under new sponsorship in Philadelphia. Most of the Rhode Island staff were successful in obtaining reemployment with the new office, including Mr. Santaniello, who became the Assistant Director. However, Mr. Ventetuolo's application for Assistant Director was rejected.

To these somewhat atypical facts, the Court must apply the now familiar concepts that govern due process claims in public employment cases. The Court must first determine whether either plaintiff has a "property" interest or legal entitlement to continued employment, and, whether plaintiffs' "liberty" interest in their reputation or future job opportunities was jeopardized by disclosure, if any, of Dr. Martinez's charges. Only if the Court finds either type of interest, must it address the further question of whether there has been a deprivation of either interest without procedural due process, and whether defendants' actions were arbitrary and capricious, constituting a deprivation of substantive due process.[1] Lastly, the Court will consider plaintiffs' pendent state claim for defamation against Dr. Martinez.

## I. "Property" Interest

█ To have a "property" interest that is protected by due process, plaintiffs must

have a "legitimate claim of entitlement" to continued employment arising out of state law. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A "unilateral expectation" will not suffice, *id.;* there must exist "rules or mutually explicit understandings that support [their] claim of entitlement . . . ." *Perry v. Sinderman,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). A claim to entitlement is established not only by express statutory or contractual terms but also by "agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances' . . . [and] 'relating them to the usage of the past' ". *Id.* at 602, 92 S.Ct. at 2700. Generally speaking, courts have recognized a property interest if, by statute, rule or contract, express or implied, the employee can only be fired for "cause", *e. g., Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); in contrast, courts have not found a property interest when the employee serves "at the pleasure" of the public employer, *e. g., Bishop v. Wood,* 426 U.S. 341, 343–47, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Mazalewski v. Treusdell,* 183 U.S.App.D.C. 182, 562 F.2d 701 (1977); *Patterson v. Ramsey,* 552 F.2d 117 (4th Cir. 1977).

█ By state statute, professional and administrative personnel in the Rhode Island Department of Education serve "at the pleasure of the commissioner of education" as unclassified employees, R.I.G.L. sec. 16–49–7 (1976 Supp.). Plaintiffs admit that they served as unclassified employees within this statutory provision. In addition, at the time of discharge, neither plaintiff was employed pursuant to a written contract that specified a fixed time period of employment. Rhode Island law presumes that

---

1. The Court need not address the more difficult issue of whether a distinct substantive due process right to be free of arbitrary government action exists even in the absence of a liberty or property interest, since plaintiffs have expressly disavowed such a claim. Although the First Circuit has held in the past that something less than a legal entitlement to

continued employment triggers this substantive due process right, *Drown v. Portsmouth School District,* 451 F.2d 1106 (1st Cir. 1971), the appellate court most recently has indicated that the issue remains open. *Willens v. University of Massachusetts,* 570 F.2d 403, 406 (1st Cir. 1978).

such open-ended contracts are terminable at will, but that presumption can be rebutted by evidence that a fixed term was intended, *School Committee of Providence v. Board of Regents,* 112 R.I. 288, 308 A.2d 788 (1973).

■ To counter the statutory provision and the absence of a fixed term, plaintiffs rely on preemployment promises allegedly made by Dr. Martinez, as Director of NEAMIDS, to establish their entitlement. Mr. Ventetuolo testified that he initially was unwilling to leave his job with the state manpower program and accept Dr. Martinez's offer of the assistant directorship at NEAMIDS because of the lack of job security. Under the union contract that governed his job with the state, Mr. Ventetuolo could only be fired for just cause. To persuade him to take the job with the new program, Mr. Ventetuolo testified that Dr. Martinez "told me that I had nothing to worry about; that as long as he was Director that he had authority and responsibility for this program, and that he would, I would have no problem with security". Mr. Ventetuolo further testified that Dr. Martinez said he could continue in his job "as long as funds were available". No similar express promise was made to Mr. Santaniello, although, according to Mr. Santaniello's testimony, Dr. Martinez did represent that, as Director, he would make the hiring and termination decisions.[2]

Even with respect to the stronger claim of Mr. Ventetuolo, these preemployment discussions do not establish a legal entitlement to continued employment binding on the Commissioner. Dr. Martinez lacked both actual and apparent authority to promise employment for an indefinite period of time, conditioned only on the availability of federal funds. *See, e. g., Mazalewski v. Treusdell,* 183 U.S.App.D.C. at 190, 562 F.2d at 709, n. 23; *Mack v. Cape Eliza-*

*beth School Board,* 553 F.2d 720, 722 (1st Cir. 1977); *Sims v. Fox,* 505 F.2d 857, 862 (5th Cir. 1974) (en banc); *Chambliss v. Foote,* 421 F.Supp. 12, 14–5 (E.D.La.1976). Such a promise, construed as Mr. Ventetuolo suggests to establish an entitlement, would abrogate the commissioner's statutory authority to terminate at will. Although the statute permits the commissioner to initially contract for up to two years with unclassified professional employees, Mr. Ventetuolo's contract was for less than a year, and, upon expiration and at the time of discharge, his contract had not been renewed.

The 1971 grant proposal outlining the organization of NEAMIDS also does not establish Dr. Martinez's authority, actual or apparent, to grant the claimed entitlement. Although the proposal specifies that the Director "shall have the responsibility of . . . selecting, supervising and terminating of personnel . . .", 1971 Proposal at 2, it also indicates that, consistent with its initial affiliation with the University of Rhode Island, the Director is ultimately responsible to an official of the University, *id.* at 1, and that "[e]mployment of personnel . . . will be conducted in accordance with all University, State and Federal laws, requirements and policies". *Id.* at Pt.C § 1.8. A University official, not the Director, signed Mr. Ventetuolo's initial contract. At all times, Mr. Ventetuolo received paychecks from the State Department of Education. All these factors clearly establish that, while within the immediate office of NEAMIDS the Director was supreme, his authority was always subject to state law and state officials.[3]

■ Moreover, Mr. Ventetuolo's actions indicate that he never labored under the misapprehension that Dr. Burke's au-

---

2. Since only plaintiffs testified at trial, their testimony stands uncontradicted. Defendant Martinez, whose present whereabouts are unknown, was not present at trial.

3. Unfortunately, the 1972 Proposal that outlined the organizational structure of NEAMIDS after its affiliation with the University had ceased, was not placed in the record and is not

available. However, Mr. Ventetuolo's testimony indicates that direct ties to the State Department of Education were strengthened. Also not in the record were guidelines promulgated by the Division of Manpower, Development and Training, United States Office of Education.

thority, as Commissioner of Education, had been supplanted by Dr. Martinez. Indeed, Mr. Ventetuolo turned to Dr. Burke as the supervising authority before the termination dispute arose, immediately after and after the suspension notice.[4] *Cf. Simmonds v. Government Employees' Service Commission,* 375 F.Supp. 934 (D.V.I.1974). Based on his previous employment with the state, Mr. Ventetuolo was familiar with the state's employment practices, including the absence of contracts, the significance of the nonclassified status, the Commissioner's authority over department directors and his power to terminate at will.[5] Although NEAMIDS was a hybrid state/federal project, Mr. Ventetuolo apparently believed the typical state bureaucratic structure was superimposed.

Lastly, Dr. Martinez's statements contained no representation that the state authority would only terminate Mr. Ventetuolo for good cause. Even viewing Dr. Martinez's statements in the light most favorable to the plaintiff, Dr. Martinez committed only himself, not the state, to retain Mr. Ventetuolo absent good cause and provided federal funds remained available. More than likely, the Commissioner would not initiate termination but only act upon the Director's recommendation. At most, Dr. Martinez was pledging his own intention not to recommend Mr. Ventetuolo's termination without good cause. Based on all the circumstances, including Mr. Ventetuolo's familiarity with state employment practices and his actual conduct, Mr. Ventetuolo understood the Director's assurance as nothing more than his own pledge. Thus, Commissioner Burke was not bound by anything Dr. Martinez said prior to Mr. Ventetuolo's employment. *See, e. g., Galaway v. Lawson,* 438 F.Supp. 968, 974–75 (D.Minn. 1976).

With respect to Mr. Ventetuolo's claim against Dr. Martinez in his individual capacity, the Court has also considered whether Dr. Martinez, by virtue of his representations, should be estopped from denying Mr. Ventetuolo's claim of entitlement to which due process rights would attach. A combination of several factors persuade the Court to reject estoppel in this case. Although Mr. Ventetuolo's testimony about his preemployment conversation stands uncontradicted, Dr. Martinez, whose present whereabouts are unknown, was not present at trial to testify to his side of the conversation. More significantly, the import of his statements to plaintiff Ventetuolo is far from unambiguous. According to Mr. Ventetuolo's own testimony, Dr. Martinez made no express promise that he would terminate Mr. Ventetuolo only for cause. When he expressed concern about losing the job security he then had with the State Department of Education, Mr. Ventetuolo repeatedly referred *not* to the guarantee under the union contract that he would be fired only for cause, but to the switch from an established program to a totally new program. The newness represented a risk in terms of future funding, a new organizational structure and new personalities in supervisory positions. Responsive to these

---

4. Although he granted plaintiffs a pretermination hearing, the Commissioner explicitly indicated that such a hearing was not required because of their status as non-classified employees. Thus, no de facto entitlement can be based on the state's granting a due process hearing. Similarly, the fact that the Associate Commissioner found no "just cause" to terminate plaintiffs and that reinstatement followed, does not support de facto entitlement. *See, e. g., Simmonds v. Government Employees' Service Commission,* 375 F.Supp. 934, 937 (D.V.I. 1974).

5. In the Rhode Island educational system, the requirement of just cause before termination applies only to tenured teachers and non-ten-

ured teachers during the term of their contract. *Jacob v. Board of Regents for Education,* 117 R.I. 164, 365 A.2d 430, 433 n. 3 (1976). Non-renewal of a contract of a non-tenured teacher, *id.* at 433, or of a superintendent or principal with administrative rather than teaching responsibilities, *Slattery v. School Committee of Cranston,* 116 R.I. 252, 354 A.2d 741 (1976); *Bryant v. Cunniff,* 111 R.I. 211, 301 A.2d 84 (1973); *Irish v. Collins,* 82 R.I. 348, 107 A.2d 455 (1954), need not be based on "just cause." Even though an appeal mechanism is provided by statute, the School Committee need not substantiate just cause for its decision not to renew. *Jacob v. Board of Regents for Education,* 365 A.2d at 433.

three concerns, Dr. Martinez's statements can be fairly interpreted to assure Mr. Ventetuolo only that the prospects for future funding were good, that the assistant directorship position would exist as long as the funding continued, that no one in Washington or Rhode Island would direct policy or personnel decisions other than Dr. Martinez and that, in a most general way, Dr. Martinez foresaw no obstacles to Mr. Ventetuolo's continued employment. In response to similar concerns expressed by Mr. Santaniello about job security, Dr. Martinez stressed only the healthy prospects for future funding of the program and his own control, making no mention of continued employment or the terms of discharge. In addition, Mr. Ventetuolo's expression of concern for the newness of the program rather than for the terms of his discharge, also indicates that, in changing his position, Mr. Ventetuolo may not have actually relied on any guarantee that he would be terminated only for cause.

Not only are the traditional grounds for estoppel not satisfied, but the untraditional legal context of this case also argues against application of estoppel. Plaintiffs did not plead breach of contract by Dr. Martinez but insist solely upon a constitutional due process claim (and defamation). Both promissory estoppel and estoppel *in pais* are typically applicable to a contract claim; their application to a constitutional due process claim against Dr. Martinez is unsettled and more troublesome. Although the First Circuit has recently considered whether to estop a University from denying de facto tenure to plaintiff, its discussion was limited to plaintiff's contract claims and was not extended to her constitutional due process claim. *Willens v. University of Massachusetts*, 570 F.2d 403 (1st Cir. 1978). In all the cases the Court has reviewed, claims that a pre-employment statement created an entitlement were never brought directly against the state official who made the statement, but rather, only against the state authority allegedly bound by the statement. *E. g., id.; Mack v. Cape Elizabeth School Board*, 553 F.2d 720 (1st Cir. 1977); *Galaway v. Lawson*, 433 F.Supp. 968,

974–75 (D.Minn.1976). For the reasons discussed *supra*, this Court has concluded that the state authority is not bound by Dr. Martinez's statements, and that no entitlement based on state law has been established. Under these circumstances, estopping only Dr. Martinez would produce an anomalous result. Dr. Martinez would be liable for failure to accord substantive and procedural due process while the ultimate appointing authority—the state department of education—was never required to extend procedural nor possibly substantive due process to plaintiff Ventetuolo. See note 1 supra. Moreover to impose due process procedures at the first tier of supervisory authority—in this case, Dr. Martinez—could lead to a serious overburdening of state employment practices with multiple and duplicative administrative procedures. Based on all these considerations, the Court holds that Dr. Martinez is not estopped from denying plaintiff Ventetuolo's entitlement claim.

## II. *"Liberty" Interest*

The difficulty of establishing principled parameters for the "liberty" interest protected by the due process clause is nowhere more apparent than in consideration of plaintiffs' claim. The protected liberty interest can take two forms, *see Codd v. Velger*, 429 U.S. 624, 633 n. 3, 97 S.Ct. 882 51 L.Ed.2d 92 (1977) (Stevens, J., dissenting); *David Gonzalez v. Calero*, 440 F.Supp. 989, 996 (D.P.R.1977). One, " '[w]here a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him' ", for example, when the basis for discharge is that the employee had been "guilty of dishonesty or immorality" which "might seriously damage [the employee's] standing and associations in [the] community", the discharged employee is entitled to due process, *Board of Regents v. Roth*, 408 U.S. at 573, 92 S.Ct. at 2707. To trigger due process, these charges must be publicly disclosed by the government entity, *Codd v. Velger*, 429 U.S. at 629, 97 S.Ct. 882; *Bishop v. Wood*, 426 U.S. at 348–49, 96 S.Ct. 2074; *Gentile v. Wallen*,

562 F.2d 193, 197 (2d Cir. 1977). Two, when the government employer imposes "a stigma or other disability that foreclosed [the employee's] freedom to take advantage of other employment opportunities", the employee is entitled to due process, *Board of Regents v. Roth*, 408 U.S. at 573–74, 92 S.Ct. at 2707. To amount to foreclosure of future job opportunities, the effect of the stigma must be more than simply to make the employee "somewhat less attractive to some other employers". *Id.* at n. 13, 92 S.Ct. at 2708 n. 13.

■ Plaintiffs claim that the circulation of both the August termination letter and the November recommendation of termination deprived them of a liberty interest without due process. Since neither plaintiff was foreclosed from job opportunities, actual or potential, defendants' action did not threaten a liberty interest of the second type described in *Roth*. As a result of their ultimate vindication, no indication of the charges appears on either plaintiff's employment record. Since their reinstatement, both plaintiffs have continued to be employed, including by the state of Rhode Island, in supervisory capacities or in other suitable positions.[6] *See, e. g., Abeyta v. Town of Taos*, 499 F.2d 323, 327 (10th Cir. 1974). *Compare with Huntley v. Community School Board of Brooklyn*, 543 F.2d 979, at 985 (no longer in supervisory position). Even during their suspension, Mr. Ventetuolo worked on a temporary basis for various educational institutions in Rhode Island. Although, during this period, their few employment applications were rejected, the August charges of insubordination and hostility toward the Director were not tantamount to a "stigma" that "foreclosed" job opportunities. *See Weathers v. West Yuma City School District*, 530 F.2d 1335, 1340 (10th Cir. 1976).

■ Nor were the charges in either letter of the character that impugned plaintiffs' reputation or good name, the other type of liberty interest recognized in *Roth*. While insubordination might severely implicate the employee's integrity or professionalism in a job that particularly required loyalty or discipline, as, for example, a policeman, *e. g., Bishop v. Wood,* 426 U.S. at 343, 96 S.Ct. 2074 (insubordination among charges), a soldier or a confidential advisor, plaintiffs' jobs were not of such a nature. Limited to the facts of this case, this Court holds that the charges of insubordination did not threaten a liberty interest. *Accord, Mazalewski v. Treusdell*, 183 U.S.App.D.C. at 193 n. 28, 562 F.2d at 712 n. 28; *Galaway v. Larson*, 438 F.Supp. at 974. *Compare with Stewart v. Bailey*, 556 F.2d 281 (5th Cir. 1977) (charges of insubordination coupled with unseemly conduct gave rise to a liberty interest). The August charges, even on their face, bespoke more of factionalism and personality conflict than wrongdoing. The November charges, which included alleged violations of office policy and incompetence, involved incidents so minor that plaintiffs' reputations were secure at all times and vis à vis all readers. *Cf. Russell v. Hodges*, 470 F.2d 212, 217 (2d Cir. 1972); *McKnight v. Southeastern Pennsylvania Transportation Authority*, 438 F.Supp. 813, 824 (E.D.Pa.1977). *Compare with Huntley v. Community School Board of Brooklyn*, 543 F.2d 979 (2d Cir. 1976) (charges of total failure of leadership, liberty interest); *Staton v. Mayes*, 552 F.2d 908, 911 (10th Cir. 1977) (wilful neglect of duty, liberty interest).

■ Moreover, the crucial element of public disclosure has not been sufficiently established. Assuming the letters were in fact sent to those persons listed as receiving carbon copies, this is not a disclosure that

---

**6.** Although Mr. Ventetuolo was not rehired by AMIDS after the office relocated in Philadelphia, Mr. Santaniello assumed Mr. Ventetuolo's former position of assistant director. The fact of Mr. Santaniello's promotion evidences that the charges by Dr. Martinez, whose credibility was destroyed, had no lasting effect on the new project sponsors. AMIDS' subsequent refusal to rehire Mr. Ventetuolo is permissible, as the Supreme Court has said:

> Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other reasons.
> *Board of Regents v. Roth*, 408 U.S. at n. 12, 92 S.Ct. at 2707 n. 12.

threatens plaintiffs' standing in the community. The persons listed by Dr. Martinez were either associated with AMIDS on the national level or responsible for the northeast region at the federal funding agency. Disclosure within an agency may implicate a liberty interest if the disclosure is gratuitous to persons with absolutely no responsibility for or interest in the local project; by contrast, these officials either had direct dealings with the local office or had been consulted previous to the August charges about the office conflicts. Indeed, plaintiff Santaniello initiated disclosure of the August letter to one of the listed national officials. Dialogue within the organization that could possibly result in a rapprochement and reinstatement must not be deterred by the threat of court judgments or the automatic imposition of administrative procedures. In all the cases the Court has reviewed, the disclosure that implicated a liberty interest involved public meetings or the press. *E. g., Owen v. City of Independence,* 560 F.2d 925, 936–37 (8th Cir. 1977); *Staton v. Mayes,* 552 F.2d at 911, n. 6; *Huntley v. Community School Board of Brooklyn,* 543 F.2d 979; *David Gonzalez v. Calero,* 440 F.Supp. at 996; *Galaway v.*

*Larson,* 438 F.Supp. 968. Disclosure to the August conference composed of staff from all regional and national offices of AMIDS would have been sufficiently public to threaten plaintiffs' reputation; however, no evidence establishes that the defendants disclosed the substance of the charges to anyone at the conference other than the officials listed on the letter. *See Galaway v. Larson,* 438 F.Supp. at 974 (voluntary disclosure by employee). By all accounts, Dr. Martinez only said, upon service of the termination letters, that they were terminated and no more. The testimony indicates only that other people in attendance at the conference inquired of plaintiffs what was going on; there is no indication that these persons knew the substance of the charges. Moreover, the only direct evidence of actual publication involved disclosure by plaintiff Santaniello, not Dr. Martinez. Finally, the fact that staff members of the local office attended the pretermination hearings which ultimately resulted in plaintiffs' vindication, does not satisfy the public disclosure requirement; plaintiffs even failed to specifically object to the staff's presence.[7]

7. Because the Court has found neither a liberty nor a property interest, the Court has not reached the position urged by defendants that the winter pre-termination hearing at which plaintiffs successfully cleared their name satisfied any due process rights plaintiffs may have had with respect to both the August and November charges. Without deciding, the Court notes that defendants' approach appears well-taken with respect to the November charges since a prompt hearing preceded any final action. Plaintiffs' suggestion that due process requires that the hearing precede any disclosure of charges is not logical since it is disclosure that, in turn, gives rise to the due process right to an opportunity to clear one's name. Plaintiffs also apparently suggest that an arbitrary preferment of charges by Dr. Martinez violates plaintiffs' substantive due process, even though the charges were ultimately rejected. In effect, plaintiffs claim a constitutional tort action akin to malicious prosecution in a state employment context. To broaden federal judicial review of the substantive aspects of merely charges that never result in a permanent change of plaintiffs' status would contravene the Supreme Court's admonition that:

The federal court is not the appropriate forum in which to review the multitude of per-

sonnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs.

*Bishop v. Wood,* 426 U.S. at 349–50, 96 S.Ct. at 2080.

Plaintiffs' proper legal recourse is a state action for defamation. *Cf. Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The non-legal remedy available to the reinstated employee is to urge the agency to subsequently remove the superior whose charges proved groundless.

As will often be the case, Dr. Martinez was in fact relieved of his duties upon plaintiffs' reinstatement.

However, unlike the November charges, the August charges did result in a significant alteration of plaintiffs' status—initially, total discharge followed by several months of suspension with pay—without any prompt opportunity to respond. *Compare with Arnett v. Kennedy,* 416 U.S. at 170, 94 S.Ct. 1633; *Gruenberg v. Kavanagh,* 413 F.Supp. 1132, 1136 (E.D. Mich.1976). Although plaintiffs suffered no monetary loss, any liberty interest in reputation or property interest in continued professional experience and growth was substantially af-

### III. Defamation Claim

■■■■■ Turning to plaintiffs' final claim,[8] the Court finds that plaintiffs have failed to establish Dr. Martinez's liability for publication of allegedly defamatory charges.

■■■ Under Rhode Island law, Dr. Martinez had a qualified privilege to disclose the August and November charges to the persons listed as receiving carbon copies. The recipients of these letters were either national officers of AMIDS who had already been consulted about the local office's internal dispute, or administrators of the federal funding agency for the regions covered by the local office of AMIDS. Such intra-organization publication is squarely within the qualified privilege Rhode Island has extended to publication between persons who share a "common interest". In *Ponticelli v. Mine Safety Appliance Co.*, 104 R.I. 549, 247 A.2d 303 (1968), the employer was privileged to disclose to its employees that plaintiff was terminated for padding production figures since the employer had an interest in deterring future padding and the employees benefitted from the warning. In *Swanson v. Speidel Corp.*, 110 R.I. 335, 293 A.2d 307 (1972), the potential employer who was informed of the grounds for discharge had an interest in knowing the discharged employee's work characteristics and the publishing employer had an interest in securing access to similar information from other employers. In both *Swanson* and *Ponticelli*, the Rhode Island Supreme Court explicitly indicated that intra-company publication to supervisors, personnel officers and other appropriate officials was likewise privileged.

The recipients of Dr. Martinez's charges had a "common interest" in the personnel of the local office, with whom they had frequent dealings. More importantly, the pitched battle between the Director and Assistant Director was guaranteed to affect the work of the entire local office, a fact of significant concern to the officials Dr. Martinez informed. Dr. Martinez also had an interest in informing officials already acquainted with the dispute and officials responsible for the future funding of the project, that he had taken positive action to end the debilitating internal strife.[9]

■■■ However, this privilege is only qualified, not absolute. Plaintiffs have the burden of establishing:

fected by the prolonged suspension. *See Davis v. Nuss*, 432 F.Supp. 44, 48 (S.D.Tex.1977); *cf. Snead v. Department of Social Services of the City of New York*, 389 F.Supp. 935 (1974) (per curiam) (three-judge court), *partially vacated on other grounds*, 425 U.S. 457, 95 S.Ct. 1985, 44 L.Ed.2d 474 (1976). *See generally Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Arnett v. Kennedy*, 416 U.S. at 167–71, 94 S.Ct. 1633, 40 L.Ed.2d 15 (Powell, J., concurring); 186–96, 94 S.Ct. 1660–1661 (White, J., concurring). Since the Court finds neither a liberty nor a property interest here, it need not decide how lengthy a period of suspension would constitute a "deprivation" that triggered due process and what kind of procedures were then required. A public employer, however, cannot evade its due process obligations merely by imposing an indefinite suspension in lieu of a termination.

8. Because the federal constitutional claims were not wholly insubstantial, *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974) and arise out of a common nucleus of operative facts, *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court has pendent jurisdiction over plaintiffs' defamation claim based on state law. Particularly in light of the case's ancient vintage and the fact that evidence and argument has already been submitted with regard to this claim, the Court, in its discretion, will exercise its pendent jurisdiction to decide the state claim, despite the Court's negative resolution of plaintiffs' federal claims. *See Siler v. Louisville & Nashville R. Co.*, 213 U.S. 175, 29 S.Ct. 458, 53 L.Ed. 760 (1909).

9. Plaintiffs have failed to establish that Dr. Martinez published the charges to anyone other than the officials listed in the letters. *See supra* at 896–897. The mere fact that Dr. Martinez chose to serve the August termination letters while plaintiffs were on the breakfast line at the national convention, fails to demonstrate that Dr. Martinez was responsible, either directly or indirectly, for their broader circulation, if any, at the conference. Thus, even assuming the qualified privilege would not extend to publication to persons connected with AMIDS but with no particular interest in the Rhode Island office, Dr. Martinez is not liable for publication to such persons.

that the primary motivating force for the communication was the publisher's ill will or spite toward [the plaintiff]. Where, however, the causative factor was the common interest, a publisher's resentment toward the person defamed is immaterial and any incidental gratification is without legal significance. *Ponticelli v. Mine Safety Appliance Co.*, 104 R.I. at 556, 247 A.2d at 308.

Although the question is not free from doubt, the Court concludes that plaintiffs have failed to establish that malice was the primary motive for Dr. Martinez's disclosure. Dr. Martinez clearly harbored fierce hostility toward plaintiffs. That animosity persisted both in August and November of 1972 when he filed and published the charges. In all likelihood, that animosity was, in fact, one motivation for the charges and their publication. The discord between defendant and plaintiffs was cited as the very reason for the August discharge. But that discord can constitute a legitimate basis for dismissal, provided no first amendment rights are infringed. Therefore, the mere fact that the bad feelings were the basis for termination does not establish that malice primarily motivated disclosure. Nor does the fact that he served the termination papers at the national conference in August establish his primary malicious purpose. If he had deliberately waited until the moment of greatest potential embarrassment—a national conference—malicious motive might be indicated. But the precipitating event apparently was a grievance session the previous night, at which Dr. Martinez believed the staff was taking sides with plaintiffs against him. In reaction, Dr. Martinez terminated plaintiffs at the earliest moment the following morning. Lastly, although all the charges were ultimately rejected by the Associate Commissioner, they were not so lacking in factual support as to persuasively establish malice. Indeed, in many instances, the Associate Commissioner found the facts supported defendant's charges but either the act did not violate office policy or did not demonstrate that plaintiffs were not contributing members of the office. With respect to the

allegation that Mr. Ventetuolo called Dr. Martinez a "mouse" in anger, the Associate Commissioner found the fact established but the infraction not serious enough to warrant termination.

In conclusion, because plaintiffs have failed to establish that Dr. Martinez was primarily motivated by malice, plaintiffs cannot recover on their defamation claim.

Defendant will prepare an order accordingly.