William W. LANDRY; Edward T. Grimley; Donald G. Poirier; Rachel E. Calcagni; Dorothy Edwardo; Stephanie C. Snee; Joyce L. Mota; Kathleen McConaghy; Patricia B. Conway; Arlene M. Romano; Carol A. Campbell; Karen M. Varone; Dorine Korpacz; and Ada F. Frank,

v.

Susan L. FARMER, in her capacity as Secretary of State of the State of Rhode Island; Anthony J. Solomon, in his capacity as General Treasurer of the State of Rhode Island; Bradford E. Southworth, in his capacity as Personnel Director of the State of Rhode Island; and Edward Casper, in his capacity as Controller of the State of Rhode Island.

Civ. A. No. 83–0147P.

United States District Court,
D. Rhode Island.

May 10, 1983.

Julius C. Michaelson, Providence, R.I., for plaintiffs.

William R. Grimm, Alan R. Tate, Asst. Atty. Gen., State of R.I., Providence, R.I., for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

In this § 1983 action fourteen state employees of the Office of the Secretary of State allege that they were wrongfully discharged in violation of the First and Fourteenth Amendments to the United States Constitution. The plaintiffs also allege that each layoff constituted a breach of contract.

The plaintiffs originally filed this action in state court where they obtained a temporary restraining order preventing the termination of their employment. Due to the substantial federal question raised in the complaint, the case was removed to Federal Court upon the petition of the defendant Secretary of State. To maintain the status quo, this Court issued a temporary restraining order. The parties agreed to consolidate the hearing on preliminary injunction with the hearing on the merits pursuant to Fed.R.Civ.P. 65(a)(2). This opinion follows that hearing.

I. *Facts*

The personnel changes at issue in this litigation took place in a highly charged political context following the election of Susan L. Farmer as Secretary of State. Susan Farmer was sworn in as Rhode Island's Secretary of State on January 4, 1983. At that time approximately 52 persons were employed in the Secretary of State's office. This case involves fourteen of those fifty-two employees. Seven are Category I unclassified employees who were hired without written contracts for an indefinite term. The remaining seven are Category II unclassified employees who were hired for a limited duration only.

The First Amendment issues raised by this case require a careful analysis of the facts leading to the defendant's decision to terminate the plaintiffs' employment. The defendant contends that the layoffs were necessary in order to improve the effective-ness and efficiency of the office of the Secretary of State. She claims that she decided, based on a detailed study by her First Deputy, Robert Vincent, that the office should be reorganized by eliminating the 14 positions held by the plaintiffs and creating 7 new positions with substantially different duties. The defendant contends that the changes were intended to provide more efficient service at reduced cost and that neither the political affiliations of the individuals laid off or hired was a factor in the decision making process. She also claims that the plaintiffs were considered for the seven new positions created by the reorganization, but were not hired because they were not as qualified as other applicants.

The plaintiffs claim that their discharge was a result of the defendant's desire to make room for political appointees. The Category I plaintiffs argue that although they had competently performed their jobs and possessed the skills necessary to carry out effectively the job duties of the seven newly created posts, they were never seriously considered for these positions. They say that they were not considered because the motivation for the personnel changes was substantially political. Their contention is that all of the individuals who replaced them in the Secretary of State's office were hired because of their political ties to Secretary Farmer or the Republican Party. Although no individuals were hired to replace the Category II plaintiffs, they assert that they were the scapegoats necessary to justify replacement of the Category I plaintiffs with political appointees. They claim that the only budgetary saving achieved by the reorganization resulted from their dismissal and that, consequently, their dismissal allowed the defendant to announce at a press conference that the reorganization was a cost-saving measure.

The evidence presented at trial related to both the general reasons for the personnel changes and the specific qualifications and political affiliations of the Category I plaintiffs and the individuals hired to replace

them. The evidence presented in each of these areas will be discussed in turn.

A. *Reasons for Personnel Changes*

Defendant Farmer testified that after several weeks in office it became apparent to her that a reorganization of the Secretary of State's office was necessary to improve its effectiveness and efficiency. The Secretary found a number of problem areas that she felt could be corrected through a reorganization. These were as follows:

1) The Public Laws for the 1982 session had not yet arrived, nearly eight months after they had been passed;

2) the Administrative Laws compilation was two years overdue;

3) the State would recoup only $6,000 of its $79,000 expense in publishing the Public Laws as a result of the distribution system then in effect;

4) the number of visitors touring the State House was minimal;

5) there was no inventory control system for stock distribution and no planned purchasing of stock items;

6) lobbyists were not monitored in any significant way;

7) no steps had been taken toward computerization of corporate records;

8) no volunteer advisory panels existed to make recommendations to the Secretary in the areas of voter registration and education, legislative information, library management, and senior citizens issues;

9) the State Manual had not had a serious editorial review in years;

10) the booklets regarding corporation laws, the Uniform Commercial Code, election laws and lobby laws needed updating and reprinting; and

11) there was little centralized management in the corporation division.

The Secretary instructed her first deputy, Robert Vincent, to develop a reorganization plan. She directed him to address the problem areas she had identified and to focus on 1) the elimination of all temporary positions, 2) creation of a new division of public information, 3) the need for increased efforts to monitor lobbying activity, 4) the consolidation or elimination of unnecessary positions, 5) the need for a larger personal staff to the Secretary of State, 6) the need for a lawyer and for a better management structure in the Corporation Division and 7) the use of word processing and computerization.

On January 25, 1983, Vincent submitted a written memorandum concerning the reorganization to Secretary Farmer. This memorandum, which was subsequently approved with minor revisions, provided that the seven (Category II) limited duration positions should be eliminated. Additionally, the memorandum called for redefining the duties of seven permanent (Category I), positions. These positions were as follows:

1) Stephanie Snee —state house guide

2) Dorothy Edwardo —senior clerk typist (Law Revision)

3) Donald Poirier —senior clerk (Elections)

4) Rachel Calcagni —clerk secretary (Corporations)

5) Joyce Mota —senior clerk (Corporations)

6) William Landry —records custodian (Documents Dist.)

7) Edward Grimley —principal clerk typist (Documents Dist.)

In the place of the Category I positions, seven new positions were created by the reorganization plan. These positions are as follows:

1) administrative assistant for public information,

2) senior clerk typist (Elections),

3) administrative aide for public information,

4) coordinator for public information,

5) confidential secretary to the Secretary of State,

6) administrative aide to the Secretary; and

7) assistant director of corporations (Legal)

Vincent testified that each of these positions involved duties which were substan-

tially different from the Category I positions eliminated by the reorganization. The Court finds this testimony credible. In the corporations division, Joyce Mota and Rachel Calcagni were terminated. Mota is employed as a Senior Clerk. In her own words, she described her job as, "in general, the certification of documents that are already filed in the Secretary of State's office, the preparing of certificates of good standing, dissolution, forfeiture, and documents of that type; the certification of bills that pass the legislature, plain copies of bills that pass the legislature, certified copy of any general laws." Calcagni types, proofreads, and checks documents for completeness and accuracy. The defendant does not criticize the work that these two individuals performed, but rather claims that their jobs can be successfully consolidated with other positions in the corporations division. By doing this, the defendant claims that it is possible to use the same position number and salary to provide Secretary Farmer with a personal secretary and administrative assistant. Both of these new jobs require a close, personal working relationship with the Secretary. The positions involve scheduling personal appointments, correspondence, phone calls, handling complaints and traveling with Secretary Farmer to personal appearances.

The reorganization plan eliminates the position of State House Guide. The uncontradicted testimony was that this is an unnecessary position for which the State is paying $13,192 a year. Stephanie Snee, the present guide, testified that she averages one tour a day and that it lasts no more than an hour to one hour and fifteen minutes. For the remaining seven hours in each day she sits at an information desk and answers questions for "people passing by". The position of State House Guide was reclassified to create a position in the office of public information. This new position will involve marshalling a corps of volunteer docents to conduct the tours as well as serving as a staff member to advisory panels to the Secretary of State. Additionally, it will involve assisting in revising the State Manual, developing documents and performing an outreach function by trying to attract students and tourists to the State House.

In the Documents and Distribution section, the reorganization calls for the termination of the records custodian, William Landry. He is charged with the responsibility for the distribution of public documents, such as the Public Laws, Rhode Island Reports and Court reports. Since this work is limited and does not demand a full-time employee it was eliminated. In its place, the reorganization plan contemplates hiring an administrative head of the Documents and Distribution section. This individual would be responsible for handling inventory control, purchasing for the entire department, including the State Library, and managing the Office of Public Information. The reorganization plan also calls for the termination of Edward Grimley's position in the Documents and Distribution section and the creation of a new position as an administrative aide in the Office of Public Information. The new position would assist in inventory control and purchasing, and would manage the distribution of documents. The duties of the old position—working the address-o-graph machinery, fetching books from the basement, stuffing envelopes—would be handled by the clerical staff.

Two other changes were made as a result of the reorganization. First, the plan creates a new position in the Elections Division using Donald Poirier's number and job title. Poirier filed and delivered election documents and proofread. The new position will expand these duties and require extensive typing and data processing skills. Second, the plan creates a new legal and management position in the Corporations Division by eliminating Dorothy Edwardo's position, which consisted of preparing General Assembly documents for filing in the Archives.

B. *Category I Plaintiffs and the Replacements*

Most of the evidence developed at trial centered on the process used by the defend-

ants to replace the Category I employees. Plaintiffs' argument that this process was substantially motivated by political considerations rests on three factual assertions. They contend that 1) the defendants never considered whether Category I plaintiffs were qualified for the new positions; 2) the individuals whom the defendant hired were all affiliated with Secretary Farmer's campaign or the Republican Party; and 3) the Category I plaintiffs were as well qualified as the persons who replaced them to carry out the duties of the newly created positions.

The Court does not accept plaintiffs' contention that Vincent did not consider whether they were qualified for the new positions created by the reorganization. Vincent testified that:

> as I said, the first thing I did when I got to the Secretary of State's office, was to review the backgrounds and read the personnel applications of every individual within the Secretary of State's office. It was in my mind, and I did have a feeling of the type of job experience they had had, the type of educational background they had had. And I set some minimum standards for the individuals that I intended to hire in these positions. And I did not see any of those standards being met by anyone in the Secretary of State's office who was not somewhat of a higher responsibility already.

1. At another point in the trial there was the following colloquy with the Court:

THE COURT: Fourteen? Did—

THE WITNESS: That's including the—. Excuse me, your Honor, that's the person who handles trademarks and notaries—

THE COURT: Whatever it is.

THE WITNESS: Technically not physically located within.

THE COURT: Not made up of four or five, you have a substantial number of people. Now, did you give any thought as to whether or not it would have been possible to select two people to do the job that you had in mind for Mrs. Farmer, personally, from somewhere out of the 14 people and thus be able to save the remaining people so that no one would have to be let go? Did you think of that?

THE WITNESS: Obviously, yes. Yes, we did, your Honor.

THE COURT: And what did you conclude?

Tr. at 47 (March 17, 1983 proceedings).[1] The plaintiffs attempt to discredit this testimony by arguing that Vincent's specific testimony throughout the trial demonstrates that he lacked any detailed or specific information about the competence of the Category I plaintiffs whom he discharged. It is true that Vincent testified that he did not interview the Category I plaintiffs for the newly created positions and that Secretary Farmer did not review the resumes of all individuals working in the office at the time of the reorganization. This does not mean, however, that the Category I plaintiffs were not considered for the new jobs. Vincent's testimony that prior to the reorganization he reviewed the backgrounds and personnel applications of all individuals in the Secretary of State's office stands uncontradicted. While the plaintiffs might have preferred a more thorough and timely examination of their credentials, the Court cannot accept their claim that they were not considered at all. It finds that Vincent considered the plaintiffs' credentials in designing the reorganization plan and that in the process he formed the judgment that none of the Category I plaintiffs were competent to perform the duties of the newly created positions.

There is substantial support in the record supporting the plaintiffs' claim that the individuals whom the defendants hired were all affiliated with Susan Farmer's campaign

THE WITNESS: I concluded that the individuals employed there did not meet in even the most—in any circumstances, the minimum qualifications I envisioned for the new positions.

THE COURT: Okay. But you're telling me you did consider that group as a group and individually, to see whether or not you could find two individuals there to go over to Mrs. Farmer's staff and you concluded you couldn't?

THE WITNESS: That would have been the easiest path to take, your Honor. And—

THE COURT: Right, but—

THE WITNESS: I certainly, yes, that would have saved a great deal of aggravation.

THE COURT: You analyzed it for that purpose and concluded it could not be done?

THE WITNESS: That's correct.

THE COURT: Is that a fair statement.

THE WITNESS: That is a fair statement.

or the Republican Party. Eleanor Taft was hired to replace Edward T. Grimley. Taft, although belonging to no political party herself, is the daughter of James Taft, Secretary Farmer's campaign manager and a Republican candidate in mayoral and gubernatorial races during the 1970s. Ellen Murphy was hired to replace Stephanie Snee. Murphy, who considers herself a Democrat, was an active political worker for Secretary Farmer during her 1980 and 1982 campaigns. Robert Chase was hired to replace William Landry. Chase, who considers himself an Independent, was an active campaign worker on behalf of Republican candidates during the elections of 1978 and 1980. In 1978 he worked for the reelection of Mayor Cianci, the Republican candidate, under the direction of Vincent. Deborah DeSimone was hired to replace Joyce Mota. DeSimone, although not a member of any political party, is the daughter of Herbert DeSimone, the former Republican Attorney General for Rhode Island, and has been active in several Republican campaigns. Lisa Berk was hired to replace Rachel Calcagni. Berk, who considers herself a Democrat, was previously a paid staff member working for the reelection of Republican Senator John Chafee.

Sarah Weaver is the only newly hired employee who was not affiliated with Secretary Farmer or the Republican Party. Weaver was hired to replace Donald Poirier. She testified that she had been politically active in her community. She supported Secretary Farmer's opponent, Democrat Victoria Lederberg, for Secretary of State. The plaintiffs do not contend that Weaver was hired because of her past political affiliations, but rather contend that her highly visible political involvement convinced the defendant that she would be a political asset in the future.

The plaintiffs also contend that the process by which the defendant hired its new employees reveals that the decisions were largely political ones. While Vincent testified that none of the new hires were questioned about their political beliefs, the evidence shows that political considerations played a role in the hiring process. By and large, the new employees were referred to the Secretary of State's office because of their political connections and were the only individuals interviewed for the new positions.

Nevertheless, the evidence does not show that Vincent had no basis for concluding that the newly hired individuals were less qualified for the new jobs than the Category I plaintiffs. Eleanor Taft was hired as the new administrative aide in the Office of Public Information. She has studied inventory systems and purchasing while earning her Bachelor of Science Degree in Business Management. Vincent felt this new position at a minimum required a college degree. In his opinion neither Grimley nor anyone else in the office was qualified to take over this job. Similarly, Stephanie Snee's qualifications for the expanded and redefined job in the office of public information were, in the opinion of Vincent, not comparable to Ellen Murphy's qualifications. Murphy was described as having extensive background in programs similar to those envisioned under the reorganization plan. She worked for the United States Department of State "in bringing international visitors or guests of this country to the United States.... She had a great knowledge of other programs used throughout the country ... to open up ... the state house to public groups. She ... has a college education ... (and is) very articulate." Vincent found that Snee did not have any of these qualifications. On the record, I do not find that Vincent's appraisal was impeached.

Vincent found that Robert Chase was more qualified than William Landry to serve as the administrative head of the Documents and Distribution section. Chase has a Masters in History, extensive experience with public documents, served as administrative assistant to the Mayor of Providence, an archivist for the City of Providence and as Executive Director of the Providence Heritage Commission. No comparable qualifications were placed in the record for Mr. Landry. Vincent also found that Sarah Weaver was more qualified than

Donald Poirier to perform the extensive typing and data processing that is required by the newly defined position in the Elections Division. Finally, it goes without saying that Dorothy Edwardo, who is not a lawyer, was not qualified for the newly created legal position in the Corporations Department.

The two remaining positions created by the reorganization involve serving on Secretary Farmer's personal staff. Lisa Berk was hired as a confidential secretary. She is a graduate of Katherine Gibbs and has a college education. Deborah DeSimone was hired as an administrative aide. She is a graduate of Brown University and was considered by the defendant to be competent to handle the case work and research functions of the position for which she was hired. Vincent testified that he did not believe Joyce Mota or Rachel Calcagni were qualified for the newly created positions on Secretary Farmer's staff.

Plaintiffs argue they were never considered; that, in fact, the new positions involved substantially the same skills as the ones that were eliminated and that, accordingly, had they been considered they would have been found qualified. This Court disagrees. As has been discussed, Vincent considered the plaintiffs' qualifications in designing the reorganization. Moreover, the Court is convinced that the reorganization was a sincere effort to improve the effectiveness and efficiency of the Secretary of State's office. Given these findings and the testimony as to the qualifications of the newly hired employees, the Court accepts defendant's conclusion that the individuals that were hired for the newly created positions were more qualified than the individuals they replaced.

*First Amendment*

Since *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), it has been clear that the dismissal of a nonpolicymaking state employee on the basis of his political beliefs or associations violates the First and Fourteenth Amendments to the United States Constitution. *See Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The defendants in this case do not contest the fact that the plaintiffs are nonpolicymaking state employees. The only question presented, therefore, is whether the plaintiffs have shown that they were, in fact, discharged because of their political beliefs or associations.

The parties disagree as to the appropriate allocation of the burden of proof in this case. Defendant contends that *Branti* and *Elrod* place on the plaintiffs the burden of proving that they were discharged *solely* for the reason that they were not affiliated with the Secretary of State or the Republican Party. The plaintiffs, on the other hand, contend that the burden of proof question presented by this case is controlled by *Mount Healthy City School Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Under the *Mount Healthy* test the plaintiff must show that his conduct was constitutionally protected, and that this conduct was a substantial or motivating factor in his dismissal. Assuming such a showing is made, the burden shifts to the defendant to show, by a preponderance of the evidence, that it would have reached the same decision even in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. at 576. *See also Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 416–17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Rosaly v. Ignacio,* 593 F.2d 145, 149 (1st Cir.1979).

The Court finds that the *Mount Healthy* test for proving a First Amendment violation survives *Branti.* *Branti* did not address the burden of proof question and the Court does not read it as requiring a plaintiff to prove that he was discharged solely for the reason that he was not affiliated with or sponsored by the political party in office. *Branti* and *Elrod* established that the discharge of a public, nonpolicymaking employee based solely on his political affiliations is constitutionally impermissible. Their holdings are important because they make clear that the First Amendment protects a public employee from discharge not only based on what he says, *see Connick v. Myers,* —— U.S. ——, —— – ——, 103

S.Ct. 1684, 1687–93, 75 L.Ed.2d 708 (1983); *Mt. Healthy City School Board of Education v. Doyle,* 429 U.S. 274, 283, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); *Perry v. Sindermann,* 408 U.S. 593, 597–98, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972), but also based on what he believes, i.e. his political affiliations. *Branti v. Finkel, supra,* 445 U.S. at 515, 100 S.Ct. at 1293. *Branti* and *Elrod* did not, however, present the Court with the question of what a plaintiff must prove to establish that he was unconstitutionally discharged because of his political affiliations. Since both cases involved factual situations in which it was found that the plaintiff's discharge was based solely on his political affiliations, the Court did not need to consider this issue.

In the absence of a specific repudiation of *Mount Healthy,* it would be inappropriate to abandon its test for proving a First Amendment violation in this case. It simply does not make sense to apply a different rule in cases like *Mount Healthy,* where discharge was based on what an individual said, and cases like *Branti,* where discharge was based on an individual's political affiliations. This Court agrees with the Seventh Circuit's observation that:

> We must reject the defendant's suggestion that we adopt a "sole motive" test in the case of terminations of employment after a change of administration following an election. To require that the plaintiff prove that the protected conduct was the "sole motive" for his termination would in our view run the risk of not adequately protecting victims of First Amendment violations. One can scarcely imagine an employee about whom an employer could not find some other dissatisfaction apart from the employee's protected conduct.
>
> *Nekolny v. Painter,* 653 F.2d 1164, 1167––68 (7th Cir.1981)

*See also Barrett v. Thomas,* 649 F.2d 1193, 1200 (5th Cir.) *cert. denied,* 450 U.S. 1022, 101 S.Ct. 1729, 68 L.Ed.2d 218 (1981); *Wren v. Jones,* 635 F.2d 1277, 1286 (7th Cir.1980). Accordingly, it concludes that where the plaintiff has established that an employ-

ment decision was substantially based on an individual's political beliefs or associations he is entitled to relief, unless the defendant proves by a preponderance of the evidence that the same decision would have been reached regardless of these beliefs and associations.

The defendant urges that the Supreme Court analysis in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), a Title VII case, makes it clear that the plaintiff retains the burden of persuasion on all issues, despite the shifting burden of production. *See Nekolny v. Painter, supra,* 653 F.2d at 1173 (Cudahy J. concurring). This Court disagrees. Retaining the *Mount Healthy* standard in cases such as this one will not "create undesirable pitfalls for successful candidates", *id.,* but rather will ensure that First Amendment freedoms are adequately safeguarded.

The analogy to Title VII is flawed because the plaintiffs' initial burden in the First Amendment and Title VII contexts are of a vastly different character. To establish a prima facie Title VII case the plaintiff must show (i) that he is a member of a protected class; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to search for applicants with comparable qualifications. *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The prima facie case in Title VII litigation "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection" and "raises an inference of discrimination only because we presume those acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Texas Department of Community Affairs v. Burdine, supra,* 450 U.S. at 254, 101 S.Ct. at 1094. In contrast to Title VII, the *Mount Healthy* test requires the plaintiff to make a far stronger showing; he must demonstrate that his conduct was constitutionally protected and that it

was a "substantial" or "motivating" factor in his dismissal. A plaintiff who has made such a showing has not merely created an inference of discrimination, but has demonstrated that, in fact, he was discriminated against because of his political beliefs or associations. In such circumstances, there is no reason for the plaintiff to retain the burden of proof. He has already made out his case. The only remaining question is whether the employer can show that he would have made the same decision even if he had not been substantially influenced by constitutionally impermissible factors.

In sum, this Court concludes that it does not make sense to analogize or extrapolate from a Title VII case to a First Amendment violation. The First Amendment holds a very special place in the pantheon of constitutional rights and a free speech violation is quite different from a breach of a statutorily created cause of action. The two cannot be equated. When a plaintiff can show a substantial violation of the treasured freedom of expression, he has established a serious breach of an inalienable societal right and must prevail, absent outweighing proof to the contrary.

■ Turning to the facts of this case, the Court finds that political considerations were not a substantial factor in the decision to discharge the named plaintiffs. To be sure it would be sheer puerile naivete not to realize that political considerations played some part in the selection of replacements. However, whatever part they played, they lacked the compulsion necessary to trigger any constitutional grievances; they were secondary to the sincere appraisal and reasoned conclusion of the Secretary that the changes that were made as part of the reorganization of her office were necessary. The Court finds the primary and overriding inducement to make the controversial changes at issue is the laudable aim to improve the efficiency of the Office of the Secretary of State and not to be fettered by the routine and practices of a predecessor who was voted out of office. This is not to say Secretary Farmer's approach is the better one, but certainly she has the right to test her own innovative and creative talents.

The recurring theme of the plaintiffs during the trial and throughout their briefs is that political considerations prompted the hiring of all the replacements. The emphasis is misplaced. To begin with, none of the applicants were questioned about their political affiliations and, indeed, as has been stated, some were Democrats or Independents and one even campaigned for Secretary Farmer's opponent. Second, and most importantly, the qualifications of all of the newly hired employees are outstanding. Finally, none of the evidence produced by the plaintiffs persuaded me that the reorganization was not a necessary positive step to improve the operations of the Secretary's office. Mr. Vincent struck the Court as a sincere credible person who would have preferred not to have the present "aggravation", but felt the confrontation had to be.

The plaintiffs argue as to all the Category I plaintiffs that they had never been chastised, reprimanded or disciplined in any respect. The plaintiffs also point out that they were never interviewed or considered for the newly created positions. I find this approach entirely unpersuasive. Chastisement, reprimand or discipline have nothing to do with competency. But even assuming it does, all that it means is that the plaintiffs were acceptable employees in the jobs they were performing. It does not demonstrate that the plaintiffs were qualified for the newly created positions. The plaintiffs also stress that Mrs. Farmer personally did not seek to determine whether any of them could perform the functions of the newly created jobs. I find it difficult to understand why such an argument is made; it is beyond controversy that complete responsibility for the reorganization was delegated to her first deputy, Robert Vincent. Finally, in the absence of a scintilla of evidence that the positions of the Category II plaintiffs are even necessary or desirable, the plaintiffs' contention that these firings were politically motivated escapes me.

In the realm of politics it is an exacting task to justify appointments, made by a

newly elected official, which replace incumbent employees:

Before examining those justifications, however, it is necessary to have in mind the standards according to which their sufficiency is to be measured. It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny. *Buckley v. Valeo,* 424 U.S. [1] at 64–65, 96 S.Ct. [612] at 656 [46 L.Ed.2d 659]. *NAACP v. Alabama,* 357 U.S. 449, 460–461, 78 S.Ct. 1163, 1170–1171, 2 L.Ed.2d 1488 (1958). "This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct . . . ." *Buckley v. Valeo, supra,* 424 U.S. at 65, 96 S.Ct., at 656. Thus encroachment "cannot be justified upon a mere showing of a legitimate state interest." *Kusper v. Pontikes,* 414 U.S., [51] at 58, 94 S.Ct. [303] at 308 [38 L.Ed.2d 260]. The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest. *Buckley v. Valeo, supra,* 424 U.S., at 94, 96 S.Ct., at 670; *Williams v. Rhodes,* 393 U.S., [23] at 31–33, 89 S.Ct., [5] at 10–11 [21 L.Ed.2d 24]; *NAACP v. Button,* 371 U.S., 415, 438, 444, 83 S.Ct. 328, 340, 343, 9 L.Ed.2d 405 (1963); *Bates v. Little Rock,* 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama, supra,* 357 U.S., at 464–466, 78 S.Ct. at 1172–1173; *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945). In the instant case, care must be taken not to confuse the interest of partisan organizations with governmental interests. Only the latter will suffice. Moreover, it is not enough that the means chosen in furtherance of the interest be rationally related to that end. *Sherbet v. Verner, supra,* 374 U.S. [398] at 406, 83 S.Ct. [1790] at 1795 [10 L.Ed.2d 965]. The gain to the subordinating interest provided by the means must outweigh the incurred loss of protected rights, *see United Public Workers v. Mitchell,* 330 U.S., [75] at 96, 67 S.Ct., [556] at 567 [91 L.Ed. 754] and the government must "emplo[y] means closely drawn to avoid unnecessary abridgement. . . ." *Buckley v. Valeo, supra,* 424 U.S., at 25, 96 S.Ct., at 638. "[A] state may not choose means that unnecessarily restrict constitutionally protected liberty. 'Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' If the state has open to it a less dramatic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper v. Pontikes, supra,* 414 U.S., at 59, 94 S.Ct. at 308 (citations omitted).

*Elrod v. Burns, supra,* 427 U.S. at 362–63, 96 S.Ct. at 2684.

Encroachment on this sensitive concern for the First Amendment precurses the ultimate erosion of the soul and life blood of our democracy. This dispute must be viewed in that spirit. The raising of serious First Amendment issues, however, is not a substitute for the evidence on which those allegations rest. On the facts of this case, I simply cannot conclude that the appointments herein discussed were substantially motivated by political patronage. To me the need for changes, the qualifications of the respective parties, and the study and consideration given to the problem belie the plaintiffs' allegations.

*Due Process Claim*

Plaintiffs assert that they were denied their constitutionally protected right to continued employment at the Secretary of State's Office without due process of law. The standards that govern due process claims in public employment cases are well settled. In *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court stated: "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of hearing

is paramount. But the range of interests protected by procedural due process is not infinite." *Id.* at 569, 92 S.Ct. at 2705.

The threshold question, therefore, is whether the plaintiffs have a protected "liberty" or "property" interest in their positions in the Secretary of State's Office. As I stated in *Ventetuolo v. Burke,* 470 F.Supp. 887 (D.R.I.1978), *aff'd* 596 F.2d 476 (1st Cir.1979):

> The protected liberty interest can take two forms, *see Codd v. Velger,* 429 U.S. 624, 633 n. 3, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (Stevens, J., dissenting); *David Gonzalez v. Calero,* 440 F.Supp. 989, 996 (D.P.R.1977). One, " '[w]here a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him' ", for example, when the basis for discharge is that the employee had been "guilty of dishonesty or immorality" which "might seriously damage [the employee's] standing and associations in [the] community", the discharged employee is entitled to due process, *Board of Regents v. Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. To trigger due process, these charges must be publicly disclosed by the government entity, *Codd v. Velger,* 429 U.S. at 629, 97 S.Ct. 882; *Bishop v. Wood,* 426 U.S. [341] at 348–49, 96 S.Ct. 2074 [at 2079, 48 L.Ed.2d 684]; *Gentile v. Wallen,* 562 F.2d 193, 197 (2d Cir.1977). Two, when the government employer imposes "a stigma or other disability that foreclosed [the employee's] freedom to take advantage of other employment opportunities", the employee is entitled to due process, *Board of Regents v. Roth,* 408 U.S. at 573–74, 92 S.Ct. at 2707. To amount to foreclosure of future job opportunities, the effect of the stigma must be more than simply to make the employee "somewhat less attractive to some other employers". *Id.* at n. 13, 92 S.Ct. at 2708 n. 13.

. *Id.* at 894–95.

Plaintiffs have not alleged that when Secretary Farmer dismissed them she publicly disclosed any allegations of wrongdoing or incompetence that tended to stigmatize them or damage their reputations in their communities. Accordingly, the Court finds that plaintiffs have not asserted a protected liberty interest.

The question of whether plaintiffs had a protected property interest in their positions in the Secretary of State's Office is more complicated.

> To have a "property" interest that is protected by due process, plaintiffs must have a "legitimate claim of entitlement" to continued employment arising out of state law. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A "unilateral expectation" will not suffice, *id.*; there must exist "rules or mutually explicit understanding that support [their] claim of entitlement...." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). A claim to entitlement is established not only by express statutory or contractual terms but also by "agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances' . . . [and] 'relating them to the usage of the past' ". *Id.* at 602, 92 S.Ct. at 2700. Generally speaking, courts have recognized a property interest if, by statute, rule or contract, express or implied, the employee can only be fired for "cause", *e.g., Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); in contrast, courts have not found a property interest when the employee serves "at the pleasure" of the public employer, *e.g., Bishop v. Wood,* 426 U.S. 341, 343–47, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Mazaleski v. Treusdell,* 183 U.S.App.D.C. 182, 562 F.2d 701 (1977); *Patterson v. Ramsey,* 552 F.2d 117 (4th Cir.1977).

*Ventetuolo v. Burke, supra,* 470 F.Supp. at 891.

As I view the positions held by the plaintiffs, they fall squarely within the above definition defining what is not a property interest. The defendants correctly point out that "none of the plaintiffs have established a contractual foundation for an expectation of continued employment ...

they neither had nor knew of any written contract or document securing their employment by the state." Moreover, all seven permanent employees testified that neither Secretary Farmer nor Vincent ever told them that they would be employed for a specific period of time. In such circumstances the employment relationship is presumed to be terminable at any time at the will of either party. *See Rotondo v. Seaboard Foundry, Inc.,* 440 A.2d 751, 752 (R.I. S.Ct.1981).

Nevertheless, as the Rhode Island Supreme Court said in *School Comm. of Providence v. Board of Regents for Education,* 112 R.I. 288, 308 A.2d 788 (R.I.S.Ct.1973);

> The rule as stated, however, is not as rigid as at first it might seem, for the presumption that a hiring unaccompanied by an expression of time is at will can be rebutted by evidence that the parties intended that it would be a fixed period. Such an intention can be gleaned from the course of prior dealings between the parties or from any other surrounding facts or circumstances which might shed any light on the question. *Minor v. Narragansett Machine Co.,* 71 R.I. 108, 115–117, 42 A.2d 711, 714–715 (1945); *Hatch v. Sallinger,* 47 R.I. 395, 397–399, 133 A. 621, 622–623 (1926); see generally I Williston, Contracts § 39 at 117 (3rd ed. 1957). Unfortunately in this case we are unable to determine what was contemplated in regard to the term of employment of each of the 75 administrators. Our inability is attributable to several causes. One is the board's failure—and the commissioner's also—to indicate upon what particular evidence, what surrounding circumstances, or what course of dealings

it could have predicated a finding that the parties contemplated that the term of employment would be fixed. That determination was, as we have already indicated, a precedent to an ultimate holding that each of the administrators had a valid and enforceable service contract with the committee.

*Id.,* 308 A.2d at 790–91.

Here, plaintiffs contend "that as a result of both statutory provisions and state regulations ... and by virtue of their length of service, they had an implied contract of employment with a right to expect continued employment until such time as the procedures specified in said statutes and regulations were precisely carried out." Plaintiffs' Brief at 55. To support this allegation,[2] plaintiffs rely primarily on Personnel Rule 4.071 of the Department of Administration, Division of Personnel, the administrative body responsible for issuing personnel rules concerning unclassified services. *See* R.I.G.L. § 36–4–8 (1969 reenactment). Rule 4.071 states, in pertinent part, "[e]mployees who are to be laid off shall be notified in writing prior to the termination date," and in "all cases of layoff, first consideration will be given to the employee's length of service within his/her present position and second to his/her length of service within the state."

There is a serious question whether this rule was in effect at the time of the plaintiffs' termination. R.I.G.L. § 36–4–8 provides that the Division rules "shall become effective when approved by the Governor". But as a rule-making agency, the Division is subject to the provisions of the Rhode Island Administrative Procedures Act (APA),

**2.** The plaintiffs also argued in their briefs that there was a violation of Rhode Island General Laws Sections 42–6–8 (reorganization within departments), 35–3–15 (revision of unencumbered and unexpended balances in appropriations), 35–3–16 (reduction of departmental appropriations to achieve a balanced budget), and 35–3–18 (transfer of appropriations). On April 22, 1983, the Court conferred by telephone with counsel and advised counsel for the plaintiffs that he had not briefed the very troublesome and substantial issue of standing. He was advised that if he was going to press his claims

and arguments based on these statutes he could have whatever time was necessary to do so, but in the face of the plaintiffs' urging to have the decision in this case expedited, I could not grant him that time and still keep in force the temporary restraining order which already has been in effect more than sixty days. After a requested delay of approximately an hour or so to weigh the problem, he advised the Court that plaintiffs abandoned their arguments that the reorganization violated these statutory provisions.

R.I.G.L. § 42–35–1 *et seq.* (1977). Section 42–35–4 of that Act provides that no agency rule shall become effective until twenty days after a certified copy of the rule has been filed with the Secretary of State. Although Rule 4.071 was approved by the Governor, the Deputy Personnel Administrator testified that the Personnel Division never filed a certified copy of Rule 4.071 with the Secretary of State. Thus, it seems clear that Rule 4.071 was not promulgated in accordance with the provisions of the Rhode Island APA, and that, therefore, it has never taken legal effect and is not applicable here.

Even assuming that Rule 4.071 was in effect at the time of plaintiffs' termination, and that it gave plaintiffs a protected property interest, the Court finds that the defendant complied with the Rule. The Rule merely requires that written notification be given to employees "prior to termination". Here, plaintiffs were given notification by letter on February 9 that they would be laid off effective February 10. The plaintiffs contend that they should have been given longer notice, but they do not cite any authority in support of this position.

The second requirement of Rule 4.071, that first consideration be given to the employee's length of service, also has not been violated. It must be kept in mind the Rule does not mandate seniority as the determining criterion. Seniority merely must be given reasonable "consideration" in the context of all the facts. Certainly this means it must be considered in relation to the need for changes in the work to be performed. Nevertheless, the state statute itself provides that "[a]n appointing authority may layoff a classified employee whenever he deems it necessary because of a material change in duties or organization, or shortage or stoppage of work...." R.I.G.L. § 36–4–37. Here, given the substantial redefinition of responsibilities within the Secretary of State's Office, it cannot be said that Rule 4.071 has not been complied with. Accordingly, the Court finds that Secretary Farmer's dismissal of the plaintiffs did not deny them due process.[3]

*Breach of Contract*

Plaintiffs further argue that each layoff constituted a breach of contract. Plaintiffs are unclassified employees who were hired for an indefinite period of time. They contend, however, that even at will employees who are discharged in bad faith have a cause of action for breach of contract. The traditional rule that an employment contract that is for an indefinite period may be terminated by either side for any or no reason has been widely criticized. *See* Note, "Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith", 93 Harv.L. Rev. 1816 (1980); Blades, "Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power", 67 Colum.L.Rev. 1404 (1967). Courts have increasingly recognized that at-will employ-

**3.** In addition to their procedural due process claim, the plaintiffs also assert a substantive due process claim. It is their position that they have been deprived of due process of law by virtue of arbitrary governmental action. They spawn this approach from an untested footnote of this Court in *Ventetuolo v. Burke,* 470 F.Supp. 887 (D.R.I.1978), wherein I stated:

The Court need not address the more difficult issue of whether a distinct substantive due process right to be free of arbitrary government action exists even in the absence of a liberty or property interest, since plaintiffs have expressly disavowed such a claim. Although the First Circuit has held in the past that something less than a legal entitlement to continued employment triggers this substantive due process right, *Drown v. Portsmouth School District,* 451 F.2d 1106 (1st

Cir.1971), the appellate court most recently has indicated that the issue remains open. *Willens v. University of Massachusetts,* 570 F.2d 403, 406 (1st Cir.1978).

470 F.Supp. at 891 n. 1.

The arbitrary government action they complain of is the alleged failure to follow the various state statutes and Rule 4.071. Since I have already found there was no arbitrary failure to follow Rule 4.071, this "difficult" issue need not be discussed. Conceding it is not acceptable judicial writing to insert personal editorial comment, I add that I admire the ingenuity of counsel in his attempt to capitalize on the *Ventetuolo* footnote. However, a case with a tenuous factual base and improbability of legal success is not the proper vehicle on which to embark on such a course.

ees may bring suit for bad faith terminations. *See, e.g., Fortune v. National Cash Register Co.,* 373 Mass. 96, 100–01, 364 N.E.2d 1251 (1977).

The Rhode Island Supreme Court has indicated that, in general, contracts contain an implied covenant to deal in good faith. *See, e.g., A.A.A. Pool Service and Supply, Inc. v. Aetna Casualty & Surety Co.,* 395 A.2d 724, 725 (R.I.S.Ct.1978); *Ide Farm and Stable, Inc. v. Cardi,* 110 R.I. 735, 297 A.2d 643, 645 (R.I.S.Ct.1972). The Supreme Court has not, however, explicitly addressed the question of whether at-will employees who are discharged in bad faith have a cause of action for breach of contract. This Court need not decide that question in the present case since it finds that plaintiffs were not dismissed in bad faith.

Plaintiffs argue that they were terminated in bad faith because employees are entitled to minimal safeguards of procedural regularity, including compliance with all applicable state statutes and regulations and the right to a hearing and notice. These safeguards are necessary to assure that dismissals are, in fact, made in good faith, as a result of legitimate business judgments. Since they were not afforded any of these procedural rights, plaintiffs contend that they were dismissed in bad faith.

■ The Court disagrees. I have previously concluded that the termination of the plaintiffs was part of an attempt by Secretary Farmer to improve the efficiency and effectiveness of her office. The Court is convinced that Secretary Farmer's decision to reorganize her office was based on legitimate business considerations. Moreover, the defendant complied with all applicable statutes and regulations in implementing the reorganization. In short, there is simply no support for plaintiffs' claim that Secretary Farmer acted in bad faith in terminating their employment.

The seven temporary employees also argue that their dismissal constituted a breach of contract. To support this claim, they rely on section 1.14 of the Personnel Rules for Unclassified Service which defines a "Limited Period Appointment" as "the appointment of a person for a stated limited period of time." The temporary employees argue that since they were appointed to serve for a six month period, they could not be terminated during that period without due cause.

The defendant, on the other hand, argues that the stated limit of six months for the jobs held by the temporary employees served as an outside limitation on the duration of their employment, and not as an unconditional promise of employment for that period. The Court agrees. The Rhode Island Supreme Court has previously held that even where an employment agreement provides that an employee will receive a fixed sum for a stated period, the agreement may be terminable at will. *See School Comm. of Providence v. Board of Regents for Education,* 112 R.I. 288, 308 A.2d 788, 790 (R.I.S.Ct.1973); *Booth v. National India Rubber Co.,* 19 R.I. 696, 36 A. 714, 715 (R.I.S.Ct.1897). The Court thus concluded that employment was at will even where the employee had been told at the time he was hired that "[s]o long as you stay here, and do what is right by the company, we will employ you and pay you by the year." *Booth v. National India Rubber Co., supra,* 36 A. at 715. Similarly, in this case the fact that the applicable Personnel Rules limited the tenure of temporary unclassified employees to six months does not provide a sufficient basis for concluding that these employees could be dismissed only for cause during that period. Indeed, it would be anomalous to conclude that temporary unclassified employees are hired for a fixed term when permanent unclassified employees and temporary classified employees serve as at will employees. *See supra* at 22; R.I.G.L. § 36–4–38 (1969 Reenactment). Accordingly, the Court finds that the temporary unclassified employees were not hired for a fixed term, and their dismissal did not constitute a breach of contract.

In accordance with the reasoning of this opinion, judgment in this case is entered on behalf of the defendants.