**John PICERNE**

v.

**Bruce SUNDLUN, et al.**

**Civ. A. No. 91–0452–P.**

United States District Court,
D. Rhode Island.

March 27, 1992.

Kurt M. Hayes, Pawtucket, R.I., for plaintiff.

Casby Harrison, Office of the Governor, Providence, R.I., for defendant Sundlun.

John A. Tarantino, Adler, Pollock & Sheehan, Providence, R.I., for defendants Baird and Cirillo.

## OPINION

PETTINE, Senior District Judge.

The plaintiff in this action sued various officials of the State of Rhode Island for their alleged wrongful termination of his state employment. Plaintiff claimed his First Amendment right of freedom of association had been violated because he was fired on the basis of his political loyalties. For reasons stated below, the Court rules in favor of the defendants.

### I.

Plaintiff is a cousin and well-known political supporter of former Rhode Island governor Edward DiPrete.[1]  On May 29, 1990, following a routine application and interview process, plaintiff was hired as Executive Secretary of the Contractors' Registration Board.[2]  He remained in that position until late August 1991, at which time he was laid off. Plaintiff claims his employment termination was based on his political affiliation; defendants contend state budgetary constraints necessitated the layoff.

After filing his complaint, plaintiff petitioned the Court for a temporary restraining order ("TRO"). I denied plaintiff's TRO request on September 4, 1991. On September 16–18, 1991, I held a hearing on plaintiff's motion for preliminary injunctive relief. As detailed in my Memorandum & Order dated September 23, 1991, I declined to issue a preliminary injunction. Finally, a permanent injunction hearing was held on October 28–30. This Opinion completes the parties' cycle of litigation before this Court.

### II.

"The First Amendment protects political association as well as political expression," *Buckley v. Valeo,* 424 U.S. 1, 11, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1976); it also protects public employees from employment termination which is based on their exercise of First Amendment rights. *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). John Picerne was a public employee hired by the State of Rhode Island. If his employment termination was based on his political ties to the former governor,

---

1. Both Picerne and DiPrete are Republicans. As a result of the November 1990 election, DiPrete was ousted by the current democratic Governor, Bruce Sundlun.

2. This position was created pursuant to the Contractors' Registration Act, R.I.G.L. § 5–65–1 and R.I.G.L. § 5–65–15(4) (July 1, 1990).

Mr. Picerne's First Amendment rights would indeed have been violated.[3]

The defendants are liable only if Picerne was discharged solely because of his political affiliation. *Hiraldo–Cancel v. Aponte*, 925 F.2d 10, 12 (1st Cir.1991); *Cordero v. DeJesus–Mendez*, 867 F.2d 1, 6 (1st Cir.1989). To prove this "but-for" connection, Picerne must show that his First Amendment activity was a substantial or motivating factor in his employment termination. *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Pontarelli v. Stone*, 930 F.2d 104, 112 n. 15 (1st Cir. 1991). The *Mt. Healthy* test requires Picerne to raise more than an inference of discrimination. *Landry v. Farmer*, 564 F.Supp. 598, 606 (D.R.I.1983). Mere speculation and conjecture can not entitle him to relief:

> Merely juxtaposing a protected characteristic—someone else's politics—with the fact that plaintiff was treated unfairly is not enough to state a constitutional claim.... What is needed is a fact-specific showing that a causal connection exists linking the defendants' conduct as manifested in the adverse employment decision, to plaintiff's politics, that is, the plaintiff must have pled facts adequate to raise a plausible inference that he is subject to discrimination based on his political affiliation or views.

*Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 58 (1st Cir.1990). However, as the First Circuit recently stated, Picerne is not limited to proving his claim through direct evidence. "Victims of heavy-handed uses of the spoils system are not limited to redress in only those (relatively rare) instances in which a 'smoking gun' can be produced. To the exact contrary, we have

held, time and again, that circumstantial evidence alone can support a finding of political discrimination." *Anthony v. Sundlun*, 952 F.2d 603, 605 (1st Cir.1991).

Only after Picerne has carried his burden of proof must defendants show by a preponderance of the evidence that they would have reached the same decision even in the absence of the protected conduct. *Mt. Healthy*, 429 U.S. at 285–87, 97 S.Ct. at 575–76; *Hiraldo–Cancel*, 925 F.2d at 12. Defendants must do more than simply to deny that they acted on the basis of partisan motivations. "Notwithstanding a person's disclaimers, a contrary state of mind may be inferred from what he does and from a factual mosaic tending to show that he really meant to accomplish that which he professes not to have intended." *Anthony*, 952 F.2d at 606.

"Resolution of the First Amendment question must depend on the particular facts of each case." *Pilkington v. Bevilacqua*, 439 F.Supp. 465, 473 (D.R.I.1977), *aff'd*, 590 F.2d 386 (1st Cir.1979). Accordingly, I proceed to an examination of the facts in this case.

### III.

On or about August 15, 1991, John Picerne received a letter from Harry Baird, Director of Administration for the State of Rhode Island. This letter informed Mr. Picerne that he was being laid off "because of a severe shortage of funds and the reorganization of the division." At trial, a more complete picture of defendants' putative motivation for the layoff emerged. Ms. Beverly Dwyer, Acting Personnel Director, testified that effecting a "substitute layoff" in Picerne's division[4] enabled her to "recapture" a position in the "merit sys-

---

**3.** There is an exception to the prohibition on politically-motivated employment termination for the "kind of close working relationship for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering v. Bd. of Education*, 391 U.S. 563, 569–70, 88 S.Ct. 1731, 1735–36, 20 L.Ed.2d 811 (1968). See also *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). None of the parties to the instant suit have asserted that the job held by Mr. Picerne fits within this exception; clearly,

the position of Executive Secretary to the Building Contractors' Registration Board is not politically sensitive in nature.

**4.** Ms. Dwyer testified that, of the five divisions within the Department of Administration, the Division of Central Services was the most appropriate division from which to cut an employee (based on employee losses from the first round of layoffs).

tem unit," which had apparently lost a disproportionately large number of employees in an earlier round of layoffs. Unfortunately for Mr. Picerne, he was the individual singled out for the substitute layoff.

Defendants took a number of steps to determine which employee in plaintiff's division would be laid off.[5] Ms. Dwyer, after securing the acquiescence of Dennis Lynch, Associate Director of Central Services, generated a computer list of the non-union personnel in the Division of Central Services, which division includes the Building Commissioner's office and the Contractors' Registration Board. This "computer run" indicated that Mr. Picerne was the least senior non-union employee in his division. According to Ms. Dwyer, the information generated by this computer run formed the sole basis for defendants' decision to lay off Mr. Picerne in particular; he was selected for lay off simply because he had less seniority than any of the ten other nonunion employees in his division.

In their Post–Trial Brief, defendants provide a thorough inventory of plaintiff's arguments contending he was actually laid off because of his political affiliation.

First, Picerne attempted to rely upon his own testimony making reference to: 1) an alleged "Republican hit list"; 2) alleged *strong* suggestions that he attend Sundlun fund raisers; 3) alleged representations by a co-worker that Picerne's job would be "saved"; 4) the receipt of a layoff notice on stationery not carrying DOA letterhead; and 5) an exit interview during which it allegedly was "expressed" to Picerne that he was being laid off for political reasons, . . . .

Second, Picerne attempted to demonstrate that a "well-known Democrat" (Whalen) was placed into Picerne's former position of Executive Secretary, allegedly without adherence to certain procedures, *i.e.*, the Contractor's Registration Board did not participate, the job

was not posted, interviews were not conducted and tests were not administered.

Third, Picerne attempted to demonstrate that other "well-known Democrats" were afforded preferential treatment with regard to the layoffs implemented by the Administration. This argument can be broken down into three components:

a) Stephanie Casbarro, an employee in the Building Commissioner's Office, allegedly was afforded preferential treatment;

b) Robert Ricci, another employee in the Building Commissioner's Office, allegedly was afforded preferential treatment; and

c) The other individuals on the computer list . . . who comprised the pool of nonunion employees in Central Services eligible for substitute layoff were allegedly afforded preferential treatment.

Fourth, Picerne attempted to show that the State's rationale for implementing a substitute layoff was a sham. Picerne attempted to do so by claiming that there existed no budgetary constraints; that a conspiracy existed to prevent Picerne from joining the union; that seniority is not a requisite in determining eligibility for layoff; and that the Merit System Unit has yet to restore a position.

Finally, Picerne attempted to meet his burden by claiming that others shared his belief that he was laid off for political reasons.

Defendants' Post–Trial Brief at 13–14.[6]

I could decide this case without any evaluation of plaintiff's arguments, since I find defendants have successfully met their burden; i.e., they have presented a legitimate, nondiscriminatory rationale for terminating Mr. Picerne's employment. However, I will comment briefly on each of plaintiff's arguments, noting at the outset that these arguments fall short of demonstrating that

---

**5.** Picerne argues that the steps allegedly undertaken by defendants were mere sham or pretense designed to camouflage defendants' true mission, which was to punish him for his political affiliation.

**6.** My review of the transcript in this case comports with defendants' recitation of plaintiff's arguments; I therefore adopt this recitation as my own.

Mr. Picerne's political affiliation was a substantial or motivating factor in his layoff.

Most of plaintiff's own testimony was uncorroborated. For example, Picerne testified that he was told during a coffee break in January 1991 that he was on a "Republican hit list." However, none of the individuals present at the coffee break remember discussing such a hit list. Most significantly, George Carello, a fellow Republican and government worker, was engaged in the following colloquy at trial:

MR. HAYES [Plaintiff's Counsel]: Mr. Picerne has maintained that at this particular coffee break discussion, Mr. Lynch and Mr. Cirillo informed he (sic) and George Carello that they were on a list to be laid off.

. . . . .

THE COURT: Did that take place?
THE WITNESS [George Carello]: I don't recall that, no.
THE COURT: You have no recollection at all of that?
THE WITNESS: No one told me that I was on a hit list or that I was going to be fired.

October 30, 1991 transcript at 50.

Similarly, plaintiff's claims that he was asked to buy Sundlun fundraiser tickets, that he was told that his job had been "protected" by someone with ties to the governor, and that his political affiliation was alluded to at his exit interview, were all uncorroborated. The fact that no one besides Picerne remembers—or will admit to remembering—any of these conversations does not, per se, indicate that the

discussions never transpired. However, as finder of fact, the Court is not wholly persuaded by Mr. Picerne's lonely testimony regarding the alleged conversations.[7] Moreover, even assuming Mr. Picerne's recollection is entirely accurate, these purported discussions do not suffice, in and of themselves, to prove that he was fired on the basis of his political affiliation.

To bolster his contention that his First Amendment rights have been violated, Picerne argues that a "well-known Democrat" (George Whalen)[8] filled his position immediately after his layoff. Defendants explain the situation as follows:

Dwyer informed State Building Commissioner, Joseph Cirillo ("Cirillo"), that Picerne (being the least senior, non-union employee in the division) would be laid off in such a manner so as to allow the Merit System Unit to recapture a position. Cirillo then undertook appropriate and necessary measures consistent with the decision to layoff Picerne. These measures included freezing a position funded from the general account (Architectural Access Inspector, formerly held by George Whalen), and having the former duties of that position assumed in part by existing employees, thus effectuating a savings to the general fund so as to allow a position to be restored to the Merit System Unit.

Defendants' Post–Trial Brief at 11–12 (citations omitted). In sum, because Whalen is now serving as "Acting Executive Secretary" to the Contractors' Registration Board, his salary is paid from the Board's restricted receipt account.[9] This move

---

7. Picerne relies heavily on the deposition of his friend, Mr. Robert Hunt, to corroborate his own testimony regarding the alleged political layoff discussions. However, Mr. Hunt's testimony primarily indicates what Picerne told him, not what he himself observed or overheard. For example, Hunt testified that Picerne had expressed concern that he (Picerne) was going to be laid off for political reasons. Hunt Deposition at 10. Mr. Hunt also testified that he shared Picerne's view that the layoff was politically motivated. However, when asked by defendants' counsel, "[I]n regard to your belief that Mr. Picerne was laid off for political reasons, upon what specific facts do you base that

belief?", Mr. Hunt responded unequivocally, "None whatsoever." Hunt Deposition at 27.

8. Mr. Whalen's status as a "well-known Democrat" is subject to some question. He testified that he is a registered Democrat, his deceased father was a Democratic councilman for the City of Warwick more than fifteen years ago, and his mother has not been active in Democratic party politics for at least a decade. September 16, 1991 Transcript at 73.

9. Restricted receipt account funds are derived from the annual registration fees paid by building contractors, and these funds may only be used for the purposes designated by statute. See R.I.G.L. § 5–65–9.

frees up the money in the general account which had been previously used to pay Whalen's salary. The general account funds now available will enable the Merit System Unit to add an employee to its earlier depleted ranks.

Defendants have thus offered a legitimate, nondiscriminatory reason for replacing Picerne with Whalen; this reason is entirely consonant with defendants' contention that Picerne was laid off due to budget constraints and reorganization of his Department. This Court is satisfied that Whalen's move into Picerne's former position was not a result of political animus toward Picerne, but rather was part of the departmental reorganization necessitated by the state's budget crisis.[10]

Picerne also alleges that others in his department should have been laid off before he was. Defendants were limited to consideration of non-union personnel in determining who to lay off,[11] although they were not then obligated to select the least senior person for layoff.[12] However, I can conceive of no fairer or more rational method for determining which non-union employee would be laid off than the seniority method implemented by defendants. The evidence introduced at trial did not contradict defendants' assertion that Picerne was the least senior non-union person in his department. Mr. Picerne may wish a different approach had been taken, since it was his misfortune to be least senior. This misfortune simply does not lead to an inescapable conclusion that defendants engaged in political high jinx.[13]

## IV.

Even if I were to find that the plaintiff has sustained his burden in this case (by successfully demonstrating that his political affiliation was a substantial or motivating factor in his employment termination), he would not prevail. Defendants have met their burden under the *Mt. Healthy* test; a preponderance of the evidence clearly indicates that they would have reached the decision to terminate Picerne's employment even if he were not a Republican party member and cousin of the former Republican Governor.

The budget crisis which has gripped Rhode Island's state government throughout the time period relevant to this lawsuit is a figment of no one's imagination. The entire New England region, as well as the nation at large, has been suffering a serious economic recession in recent years. The state's budgetary problems reflect the hard times whose effects reverberate all around us. This budget crisis has forced the state's political leaders to make many painful decisions, including the decision to significantly reduce the number of state employees. See Governor Sundlun's Executive Order 91–11 (Feb. 7, 1991).

Defendants have successfully demonstrated that Mr. Picerne's layoff was part of a larger scheme designed to balance the effects of employee cutbacks among the state's various departments. Ms. Dwyer testified that the impetus for Picerne's lay-

10. Picerne argues that discriminatory animus can be inferred from defendants' failure to post Picerne's former job or to conduct interviews prior to placing Whalen in the position. However, Whalen is merely serving as "Acting" Executive Secretary; moreover, he was interviewed as a finalist for the position in 1990, when Picerne was ultimately chosen for the position. Thus, I find his temporary placement in Picerne's former position was not effected in an illegitimate manner.

11. Dennis Lynch, Associate Director of the Division of Central Services, testified that, "[b]ecause there had been union layoffs before and subsequent agreements with particular unions that precluded any more union layoffs," the defendants were limited to laying off a non-

union employee in August 1991. September 18, 1991 Transcript at 54.

12. Mr. Harry Baird, Director of Administration, testified that, in selecting individuals for layoff, "[t]he state had the option within the rules to go by classification, not totally by seniority." September 16, 1991 Transcript at 24.

13. The specific individuals who allegedly received "preferential treatment" (because their jobs were spared, while Picerne's was not) are all either union employees or have greater seniority than Picerne. None of these individuals received preferential treatment, since none of them was the least senior non-union employee. Therefore, it is irrelevant that their layoff would have prevented Picerne's layoff.

off was the Merit System Unit's inability to perform its functions because it had lost so many employees in an earlier round of layoffs.[14] Picerne's division had been spared the harshest effects of the first-round cuts; it was logical to substitute a layoff from his division for one of the positions earlier excised from the Merit System Unit. Because of an agreement with the state employees' unions that no union employees would be laid off following the first wave of layoffs, defendants could only look to the nonunion employees in Picerne's division to effect the substitute layoff. Defendants chose, quite rationally, to lay off the least senior individual—a decision which reflects both common employment practice and common sense.

Based on this, I cannot say that but for John Picerne's political affiliation, he would have remained employed. Defendants have offered a plausible, legitimate, nondiscriminatory explanation for their decision to terminate his employment. This Court is not blind to the skepticism which pervades Rhode Island politics, however. Defendants' impartiality might have been truly tested if the least senior nonunion Central Services employee had been a generous and loyal supporter of the Democratic Party. Still, Picerne simply has not convinced this Court that his layoff resulted from defendants' political vendetta against him rather than from a managerial decision based on financial necessity.

Accordingly, I find that defendants have not violated plaintiff's First Amendment rights by terminating his employment. Plaintiff's request for injunctive and other relief is hereby denied.

SO ORDERED.

---

14. According to Picerne, defendants' stated goal of restoring a position to the Merit System Unit is wholly disingenuous, since the position had not been filled as of the time of trial. As Ms. Dwyer testified, however, a public hearing was required before the position could be classified. This public hearing had already been held, and Ms. Dwyer was awaiting the governor's approval of the classification before she could begin advertising and recruiting for the position. October 30, 1991 Transcript at 93. Given this testimony, I am satisfied that defendants are proceeding in an appropriate manner in filling the Merit System Unit position.